[Crim. No. 4226.   Second Dist., Div. One.   Feb. 14, 1949.]

THE PEOPLE, Respondent, v. FRED ANTHONY et al., Defendants; JESSE HOUSTON, Appellant.

Morris Lavine for Appellant.

Fred N. Howser, Attorney General, and Howard S. Goldin, Deputy Attorney General, for Respondent.

YORK, P. J.—In an amended information filed by the District Attorney of Los Angeles County, defendant Jesse Houston, together with Fred Anthony, was charged with three counts of robbery and three counts of assault with a deadly weapon with intent to commit murder. Such information further charged that at the time of the commission of said offenses, defendants were armed with deadly weapons, to wit: two revolvers; and also charged three prior convictions of felonies against defendant Houston.

Defendant Houston was duly arraigned on August 15, 1947, and regularly entered his plea of "Not Guilty as charged in each count of the amended information." Also, on August 15, 1947, the public defender was appointed as said defendant's counsel by the court, and the case set for trial on December 1, 1947. In some manner, the public defender was not notified of such appointment and he failed to appear on December 1, 1947. On this latter date, the public defender's office was notified of its appointment to represent defendant Houston, and the trial was continued to January 8, 1948.

On January 8, 1948, the public defender appeared and made a motion for a continuance on behalf of defendant Houston, which motion was denied.

Subsequently, a jury was waived and the court found defendants "Guilty as charged in Counts 1, 2, 3, 4, 5, and 6 of the amended information." The court also found that the crimes set forth in counts one, two and three to be robbery of the first degree, having found the allegation to be true that defendants were armed at the time of the commission of the offenses so charged. Defendant Houston's motion for a new trial having been denied, judgments were pronounced and defendants were sentenced to imprisonment in the state prison for the term prescribed by law as to each of said counts. Defendant Houston was adjudged an habitual criminal under section 644a of the Penal Code, and as to him counts one, two and three were ordered to run concurrently; and counts four, five and six were ordered to run concurrently with each other, but consecutively with counts one, two and three.

This appeal is prosecuted by defendant Houston from the judgments of conviction and from the order denying his motion for a new trial, on the following grounds:

(1) "The trial court committed prejudicial error in denying appellant's motion for a continuance at the time set for trial, this denial constituting a denial of due process of law."

(2) "The evidence was insufficient to sustain the verdicts."

The events out of which the instant prosecution arose are briefly as follows: Mr. Robert H. Eason testified that on June 16, 1947, he was the assistant manager of the Citizens National Bank located at 8th Street and Vermont Avenue in the city of Los Angeles; that on that date Florence Hansbrough, Mr. Ray E. Northrip and Mr. Richard Sherwood were employees of the bank, and Mr. Jack Liberman was a customer; that he first saw appellant at about 10:20 a. m. when the latter stuck what looked like a .38 caliber revolver in Eason's back. In court Mr. Eason positively identified appellant as the man who had placed the gun in his back. Mr. Eason denied having seen a white-handled Colt revolver, which was marked plaintiff's Exhibit 1 for identification, but he identified a .32 caliber revolver of Spanish make, black in color, with a black wooden handle as the gun which had been placed against his ribs by appellant. Mr. Eason first noticed appellant when the latter vaulted over a rail behind his desk, at which time appellant placed a gun in his ribs and exclaimed, "Get the hell back in the vault." In addition to the gun, appellant carried a paper shopping bag about 2½ feet wide and about 1½ feet deep, and wore a black mask which covered his face up to his eyes. His right hand was encased in a canvas glove. At appellant's command, Eason went back into the vault which was located about 25 or 30 feet from his desk; that as they walked directly behind the tellers' cages to get to the vault, Eason had noticed that Mr. Northrip, the first teller, had turned in an alarm; that the witness walked into the vault with appellant prodding him in the back with the gun; that when opened, the vault proved to be empty, whereupon appellant inquired where the money was located and Eason declared that the first teller had it; that they then proceeded to the cage of Teller Ray Northrip. While appellant stood holding the gun, Eason stated, "It looks like we're going to have to give him the money." That Northrip then proceeded to the cash vault and opened the deposit box, whereupon appellant transferred the gun to his left hand, reached down with his right hand and started to fill the shopping bag with one, five and twenty dollar bills plus those of larger denominations. These bills were banded in $500 packages, and appellant took about 25 or 30 packages, during all of which time appellant held the gun on Eason and Northrip with his left hand.

After getting the currency in the bag, appellant directed the two men to walk to the front of the bank. At that time

a customer of the bank, Jack Liberman, came out of the safety deposit vault carrying a safe deposit box under his arm. When appellant saw that box he ordered Liberman to put it in the shopping bag, but Liberman refused to do so, and appellant took his pistol, hit Liberman across the face from his ear to his chin, grabbed the box and threw it into the shopping bag, and started running toward the front door. The last that Eason saw of appellant was when he observed him walking west on 8th Street with the shopping bag in his hand. Mr. Eason further testified that he had observed a small colored man standing near the door of the bank, with his right hand under his coat and to the side as though he had a gun, but he did not see any gun; that he later learned that this man was defendant Fuller. Within a short time after the holdup, Lieutenant Stromwall of the police came to the bank bearing the stolen money and the safe deposit box. Mr. Eason counted the money in the packages and found it amounted to between $16,000 and $17,000. This witness then accompanied Lieutenant Stromwall to the Georgia Street Receiving Hospital where he saw Fuller sitting on a chair, and defendants Anthony and Houston lying on separate operating tables. He then saw the gun which had been marked as People's Exhibit 2 for identification and identified the appellant as the man who held him up.

In court Eason identified a black handkerchief as one he had seen tied around appellant's face during the holdup, but which had kept slipping down onto his neck. On cross-examination, Mr. Eason reiterated he had faced appellant on several occasions in the bank vault, during which time the mask had slipped from appellant's face; and that appellant made no effort to replace the mask; that "from the time he went into the vault until he left, I don't think the mask was ever over his face. Q. Do you mean his eyes, nose and features were outside? A. Definitely."

Miss Florence Hansbrough testified that on June 16, 1947, she was employed as a teller at the bank here involved; that around 10:20 a. m. a colored man wearing a felt hat, with a black handkerchief around his neck, came up to her window, pulled a gun out of a paper shopping bag, pointed it at her and demanded all of her money, stating it was a holdup; that at the time the gun was pointed at her the man had not worn a mask, so that she could see his face from about 3 feet away. When the man stated he would kill her if she didn't follow his orders, and because she was afraid of the cocked gun, she

gave him all of the bank's currency in her cash drawer amounting to $300 or $400 in denominations of ones, fives, tens and twenties; that when appellant was not satisfied and demanded all of the larger bills that she had, she gave him an additional $200 or $300 in large bills; he also took all the loose coins in her till, making a total of approximately $700 or $800 which he took from this witness. Miss Hansbrough identified appellant at the trial herein as the man to whom she had given all of this money and also identified him as the man who had held a gun on her the day of the robbery. She also saw a colored man standing near the front door of the bank with his right hand under his coat; that she later saw this man at the Georgia Street Receiving Hospital and learned that his name was Fuller. After appellant left her window, Miss Hansbrough saw him go to Mr. Northrip's window; saw him hold a gun on Mr. Northrip and saw the latter hand over money to appellant. She then saw him go to Mr. Eason's desk, and saw him prod Mr. Eason in the back with his gun as they disappeared into the vault. Miss Hansbrough testified that the first time appellant pulled the mask over his face was when she saw him near Mr. Eason's desk. This witness also saw appellant run from the bank with the gun in his hand and with a safety deposit box protruding from a paper shopping bag; that after appellant departed from the front door she saw him carry the shopping bag into the alley near the bank.

Mr. Ray Northrip, the first teller of the bank, testified that on June 16, 1947, about 10:30 a. m. a colored man placed a pistol on the counter, pointed it at the witness and said: "Give me your money. This is a hold-up." That the gun aimed at him was similar to plaintiff's Exhibit 2 for identification; that the man with the gun had no covering on any portion of his face; that he wore a brown felt hat and a scarf around his neck. At the trial this witness positively identified appellant Houston as the man who held him up at the bank. Upon appellant's demand, Northrip reached into his cash drawer and handed over the one and five dollar bills therein, which appellant placed in the shopping bag which he carried. Appellant then demanded the "big bills" and the witness replied that he had none. After the witness stated he had no more money, appellant vaulted the counter, pulled up his scarf, told the colored man at the door to keep people from coming in and out of the bank and proceeded to Mr. Eason's desk. Shortly thereafter, appellant and Mr. Eason came out of the vault and approached the witness, whereupon appel-

lant ordered him and Eason back to the vault for the rest of the money; that at the point of a gun, the witness Northrip opened the deposit box and appellant transferred his gun to his left hand and scooped up the money and put it in the shopping bag; that this money was in bills of ones, fives, tens and twenties and was wrapped in $500 and $100 packages; that appellant took from Northrip's cage about $500 plus about $14,000 in $500 packages.

This witness also testified with respect to the robbery by appellant of the bank's customer, Jack Liberman.

About 45 minutes later, Mr. Northrip went to the Georgia Street Receiving Hospital where he saw the colored man who had been at the door and learned that his name was Fuller; also on one of the operating tables he saw appellant Houston. That about 20 minutes after the holdup, Lieutenant Stromwall and some other police officers had brought the shopping bag back to the bank; that the Liberman safe deposit box was in the bag when it was returned; that with the exception of about $194, all of the money taken from the bank was returned.

When the police arrived at the scene, a 1942 green Buick sedan occupied by three colored men, and the license plate covered by a white cloth, was starting out of the alley back of the bank in low gear. Officer McMullen testified that the police car with the red light on and the siren sounding pursued the Buick at a speed of 50 miles per hour and finally at about 75 or 80 miles, through the streets in the neighborhood of the bank, until the Buick hit another car and headed over the south curb of 8th Street near Mariposa and came to a stop. During this time, said officer testified he noticed defendant Anthony was driving the Buick and that appellant Houston was seated in the right front seat and defendant Fuller in the rear. As soon as the witness got out of the police car, Anthony opened the left front door of the Buick and fired two shots at the officers, McMullen and Simmons. In the gun battle which followed between the officers and defendant Anthony, many shots were fired. During this time, Officer McMullen observed appellant get out of the right front seat of the Buick with a gun in his hand; that when appellant headed east on 8th Street, both officers fired at the same time; that Simmons' bullet hit appellant in the leg and McMullen's hit him in the head. At about this time, Officer Maier arrived on a motorcycle and disarmed Houston. Shortly thereafter, a light-handled gun which had been used by defendant Anthony was found in the front seat of the Buick; this gun was

marked People's Exhibit 1 for identification; when found by the police, it contained five empty shells and one live round. Officer McMullen also identified People's Exhibit 2 for identification as being the gun that appellant Houston held in his hand. When recovered by the police, this latter gun was fully loaded and gave no evidence of having been recently fired.

After the recovery of the weapons, Officer McMullen noticed on the floor in the rear of the Buick a shopping bag about three-quarters full of currency which also contained a safe deposit box. Subsequently, the money was turned over to Lieutenant Stromwall. At the scene of the gun fight, Officer McMullen had seen the black handkerchief, marked People's Exhibit 3 for identification, around appellant's neck. In the gun battle, McMullen was shot through the pant's leg of his uniform, Officer Simmons on the inside part of his leg, and Officer Maier in the right thigh.

Officer Maier identified People's Exhibits 1 and 2 as guns recovered from the Buick automobile, as well as Exhibit 3, the black handkerchief, stating he had picked it up on the sidewalk about 3 feet from appellant Houston. On cross-examination, this witness admitted that he found no gun on appellant Houston; that he found only two guns in the car, one of which was fully loaded, while the other contained five empty shells plus one round of live ammunition.

Defendant Anthony, testifying in his own behalf, stated that on the morning of June 16, 1947, he had taken two friends named Ernest Fuller and another fellow named "Mack" to 8th Street and Vermont Avenue to take care of some kind of business; that after the car had been parked in a lot near an alley, and after Fuller and Mack had left, the witness saw Jesse Houston walking across the parking lot; that the witness and said Houston had a conversation regarding automobiles; that Houston got into the Buick and sat in the back seat; that about three minutes later Fuller returned carrying a gun and got into the left back seat of the car; that Fuller threw a paper shopping bag into the car and ordered Anthony to drive off; that as the witness complied, he noticed a police car through the rear mirror; that the last he saw of Mack was when the latter was running toward Vermont Avenue. After the chase by the police car, Anthony's car was brought to a stop; Anthony denied having fired any shots and denied that he ever had a gun in his hand. After he started driving the car, Anthony remembered nothing about appellant Houston's actions.

Appellant Jesse Houston testified that he left his home about 8:45 a. m. on June 16, 1947, arriving at Beverly Boulevard and Vermont Avenue at about 9 a. m. From there, he walked to the T. and O. Gas Station located at Hobart and Pico, Los Angeles, where, a few minutes after 9, he saw two men named Teddy and Oscar, who were in charge of that station; that he had gone there with the hope of purchasing a cheap automobile, and had on his person $368 and some odd change; that this money was his but had been loaned to him by a Mrs. Mattie, who was a friend of his mother, by a cousin and a nephew; that he had also received a loan on an insurance policy; that he had asked his mother for a loan and she had given him about $300 in all. Appellant stated he left the T. and O. Gas Station where he had seen Oscar and Teddy at approximately 9:05 or 9:10 a. m. and went to a place right next to the Smiling Irishman's lot at Pico and Vermont where he saw a young man in charge of the place; that he left there about 9:15 or 9:20 a. m. and went to Murphy Motors at 708 S. Vermont, arriving there at 9:25 or 9:30 a. m.; that he met one Ricardo Olivas there and remained with him for about 10 minutes, leaving there about 9:45 a. m.; that he then went to the Trailer House lot at 6th and Vermont arriving there shortly before 10 o'clock and had a talk with Miss Ada Perkins; that five minutes later he returned to Murphy's where he arrived shortly after 10 o'clock; that subsequently he walked to 8th and Vermont, where he arrived not long after 10 o'clock, and spied a 1942 green Buick sedan parked in an alley with Fred Anthony behind the wheel; that appellant knew Anthony and thought it would be a good time to discuss a 1941 Pontiac car; that appellant sat in the Buick and talked with Anthony about automobiles; that suddenly a man named Fuller appeared carrying a white-handled pistol, and a man named "Mack" hollered "Police"; that Fuller placed the white-handled pistol on the back of Anthony's neck and ordered him to drive away quickly; that appellant, who had been in plenty of trouble, could not get out of the Buick before it picked up too much speed; that he was in the Buick while it was being chased by the police car; that after the Buick was brought to a stop, appellant was shot twice in the affray; that shortly thereafter he was taken into custody and searched; that approximately $368 and change was taken from his person. Appellant denied that he had ever possessed the black cloth identified as People's Exhibit 3, and denied

that he had seen it at any time. He stated that the cloth, a hat and a shopping bag had been thrown into the Buick by the man named Mack, and that he had never seen those things before Mack threw them into the car. Appellant also denied that he had ever gone into the bank or held anyone up with a gun and declared that he never had in his possession either of the guns labeled People's Exhibits 1 and 2.

Appellant's mother, Mrs. Nannie Houston, testified that she had assisted him to raise funds for the purchase of an automobile; that prior to June 16, 1947, she had secured for him loans in the total amount of $150 from a Miss Ada Perkins and a Mrs. Katie Abercrombie; that appellant had also obtained $166 and some cents on an insurance policy from the Metropolitan Insurance Company.

Oscar Jackson testified that he worked at the T. and O. Gas Station at 2957 West Pico; that he had seen Jesse Houston there on a number of occasions but could not specifically recall that he was there at approximately 9 a. m. on June 16, 1947.

At the request of appellant's counsel, the People stipulated that if Ricardo Olivas were called as a witness he would testify that he saw appellant in the vicinity of Murphy Motors, at 7th and Vermont, sometime on the morning of June 16, 1947; it was also stipulated that if Miss Ada Perkins were called as a witness she would testify that she saw appellant at the Trailer House at approximately the time stated by appellant.

■ Appellant urges that there was not sufficient proof to sustain the charges preferred against him, and that the charges of assault with intent to kill were not properly chargeable against him because they were not his acts but the acts of someone else. However, the evidence as above outlined established beyond a reasonable doubt that appellant was guilty of the offenses charged against him. The gun battle between defendants and the police officers resulted from the efforts of the defendants to escape with their loot and the record is clear that defendant Anthony fired five shots at the police officers. There is evidence in the record that appellant was seated in the right front seat of the Buick and that he got out of the car with a gun in his hand. Although appellant's gun was loaded, and had not been recently fired, nevertheless the shooting by the codefendant Anthony was done in furtherance of the common purpose to escape with the proceeds of the robbery and was therefore attributable to appellant. As was so aptly stated in *People* v. *Kiser,* 22 Cal.App.2d 435, 439 [71 P.2d 98]: ". . . even though the jury may have had the

impression that because one of the defendants was not in the physical possession of a 'gun', the verdict as to him should be different from that which should be returned as to the other defendant, nevertheless, the law is well established that in the commission of a felony by two or more persons, the possession and use of a 'gun' by one of such persons constitutes a possession and use of the weapon by each of the others. . . ."

As his main point on this appeal, appellant urges that the "denial by the trial court of a continuance was not only prejudicial error, but was a denial of due process of law guaranteed by the fourteenth amendment to the Constitution of the United States."

On August 15, 1947, appellant was arraigned, such proceeding taking place at the General Hospital, appellant pleading "Not Guilty as charged in each count of the amended information," and admitting the prior convictions as alleged in such information.

At that time trial was set for December 1, 1947, and the public defender was appointed as counsel for appellant. When the cause was called on December 1, 1947, the minutes of the court show that the following proceedings took place: "Counsel for Defendant Fred Anthony having failed to appear and the Public Defender's Office not having been advised that the Public Defender was appointed on August 15, 1947, to represent the Defendant Jesse Houston and no representative of that office being present to represent Defendant Jesse Houston, cause is continued to January 8, 1948 at 9:00 A. M. for trial as to each defendant."

When the cause came on for trial on January 8, 1948, Mr. Hill representing the public defender's office stated as follows: "If your Honor please, your honor may recall that when the case was first before your honor the public defender's office was taken by surprise never having been notified of any appointment.

"The Court: Yes, I remember that. Mr. Hill: I was not even in Los Angeles; I was in the Santa Monica court at the time and it wasn't until I returned that I found that the case was set for trial for this date. By reason of the fact that the defendant was over in the general hospital and inaccessible to me at that time, I haven't had an opportunity to go over the case with him with the minuteness that the case requires. I have been informed by him that there are some seven or eight witnesses he desires to have subpoenaed. It will require some investigation in the interview of witnesses and the possibility

of subpoenaing at least some of them. There is no legal cause, I realize, that we can show at this time for a continuance, other than the fact of the mix up where we haven't had the opportunity adequately to prepare the case and investigate it.

"The Court: How about you Mr. Taylor? Mr. Taylor: My client, I think I represented him at the preliminary hearing and so as far as I am concerned I am ready for trial.

"The Court: In that respect you may be able to assist the Public Defender, is that right? Mr. Taylor: I am glad to assist him all I can. The Court: Of course, Mr. Hill, I realize your position; at the same time this is the second time this case has been here for trial. The witnesses have been here on two occasions and it is manifestly unjust and unfair to them to have them come back again. The Public Defender was notified on the 1st day of December. That is over thirty days ago. Mr. Hill: I realize all of that. The Court: You stated there is no legal ground for continuance. Mr. Hill: The fact is that I feel that I am not prepared to adequately represent him, if he had any defense. I think that the case ought to be properly investigated and properly presented to the court. The Court: The motion for continuance is denied. The matter will be a jury trial? Mr. Hill: Will you pass it to the end of the calendar. The Court: All right."

The cause was on trial January 8 and 9, 1948, and appellant's motion for a new trial was heard on January 19, 1948.

Section 1050 of the Penal Code provides: "The court shall set all criminal cases for trial for a date not later than thirty (30) days after the date of entry of the plea of the defendant. No continuance of the trial shall be granted except upon affirmative proof in open court, upon reasonable notice, that the ends of justice require a continuance. . . . No continuance shall be granted for any longer time that it is affirmatively proved the ends of justice require. Whenever any continuance is granted, the court shall enter in its minutes the facts proved which require the continuance. . . ."

"It is within the jurisdiction of the trial court to determine what constitutes sufficient cause for a continuance. It may grant a continuance because of the absence of a material witness and for absence of counsel. . . . And it is within the discretion of the trial court to refuse a continuance on the ground that prior engagements of counsel were such as to prevent him from making due preparations for the trial." (8 Cal.Jur. § 282, p. 211.)

In *People* v. *Rokes,* 18 Cal.App.2d 689, 693, 694 [64 P.2d 746], the appellant therein urged that the trial court committed prejudicial error in refusing to continue the trial of his case to a later date. It was there stated: ''The first proposition urged by appellant Hansley is untenable for the reason that before this court will consider an alleged error of the trial court in refusing to grant a continuance of a trial, appellant must have (1) made a motion for continuance before the trial court, and (2) supported such motion with affidavits setting forth facts warranting the trial court in granting his application. (8 Cal.Jur. 212.) In the present case, appellant Hansley failed to comply with either of these requirements.''

In *People* v. *Franklin,* 41 Cal.App.2d 669, 670 [107 P.2d 500], where appellant prosecuted the appeal in propria persona, the following appears: ''Before the State had put in its proof, he asked to be placed on the witness stand for the purpose of making a statement in support of an application for a continuance of the trial. No affidavit was filed in support of the motion, and, when defendant failed even to give the name of the absent witness, his application was properly denied under the terms of section 1050 of the Penal Code, which outlines the procedure necessary to be taken in support of such application. (*People* v. *Schenk,* 19 Cal. App.2d 503 [65 P.2d 895].) A request for a continuance of the time of trial under such circumstances, as well as a request for a change of counsel, is a matter which is strictly within the discretion of the trial court, and we will assume that that discretion was properly exercised when as here no showing is made to the contrary.''

In his brief on appeal, appellant refers to the fact ''that the Public Defender at no time prior to trial conferred with the defendant or subpoenaed some seven or eight witnesses that the defendant desired to have called; nor did he investigate the case or interview any of the witnesses or any of the facts which might have enabled him properly to prepare the defendant's defense.''

As heretofore stated, the public defender admitted he had no legal ground for a continuance, and sought the same because he had not had an opportunity to go over the case with appellant ''with the minuteness that the case requires.'' The names of the seven or eight witnesses that appellant desired to call were not revealed; and the materiality of the evidence sought to be elicited from them was not disclosed.

Section 1049 of the Penal Code provides: "After his plea, the defendant is entitled to at least five days to prepare for trial."

In the instant cause, the public defender, after notice of his appointment, had in excess of 30 days in which to prepare appellant's defense, and at the time the motion for a continuance was made, there was no showing that such period for preparation was inadequate.

In *People* v. *Winthrop*, 118 Cal. 85, 87 [50 P. 390], defendant was convicted of robbery and sentenced to life imprisonment. On appeal he urged that the court violated his rights in compelling him to go to trial with unseemly haste, and without sufficient time to adequately prepare for his defense. Rejecting his contention, the court declared that the record failed to disclose a case violative of defendant's right to a reasonable opportunity to prepare for his trial, stating: ". . . We cannot say as a matter of law that a period of seventeen days was not sufficient time, under the circumstances surrounding him, for such purpose; and the record fails to show that it was not such as a matter of fact. . . ."

In *People* v. *Dorman*, 28 Cal.2d 846, 852 [172 P.2d 686]: ". . . trial did not commence until at least the seventh day after employment of private counsel, and appointed counsel, who had the preparation of the case for more than a month, remained to render assistance until the trial started. The conduct of the defense was full and fair. The fact that 33 witnesses testified for the People and only three in addition to the defendant appeared in support of the defense does not necessarily show lack of time for preparation. Considering the rights of the State as well as of the defendant, the time allowed for preparation was not unreasonable. The record discloses that the defendant was ably and energetically represented by counsel of his choice. Representation was not a mere formality, but was representation in fact. None of the defendant's substantial rights were denied him by the action of the trial judge in refusing to grant a further continuance when the case was finally called for trial. (See, also, *People* v. *McNabb*, 3 Cal.2d 441 [45 P.2d 334]; *People* v. *White*, 137 Cal.App. 467 [30 P.2d 555]; *cf. People* v. *Simpson*, 31 Cal. App.2d 267 [88 P.2d 175].)"

There is no claim that appellant was not available for consultation with the public defender during the period from December 1, 1947, to January 8, 1948. This is not a case

where appellant was denied counsel or the opportunity to consult with such counsel; nor is it a case where counsel was denied a reasonable time in which to prepare for trial.

When the People had concluded its case on January 8, 1948, the public defender stated: "I am in a dilemma, of lack of witnesses. The subpoenas have been drawn up, and I assume will be served sometime this afternoon, or tonight, so that I am forced to ask for a continuance until tomorrow. The Court: We will have to go into tomorrow, anyway." On January 9, 1948, appellant took the stand in his own defense, and Nannie Houston and Oscar Jackson were called and testified as witnesses for him. Also, stipulations were entered into with respect to what the testimony of two other witnesses would be if they were called.

An examination of the entire record herein discloses that appellant's defense was ably conducted, and that he was in no way prejudiced by the denial of his motion for a continuance.

For the reasons stated, the judgments and order appealed from are, and each of them is, affirmed.

Doran, J., and White, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 14, 1949.