[Crim. No. 5618. In Bank. Nov. 30, 1954.]

THE PEOPLE, Respondent, v. GEORGE R. DAVIS, Appellant.

John H. Marshall and Richard E. Erwin for Appellant.

Edmund G. Brown, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

SPENCE, J.—Defendant, an osteopath, was charged with four counts and found guilty on two counts of having committed abortions. (Pen. Code, § 274.) He appeals from the judgment of conviction and the order denying his motion

for a new trial. He contends that the judgment should be reversed because: (1) the trial court denied his motion for a continuance and thereby violated his constitutional rights; (2) the trial court committed prejudicial error in admitting certain testimony regarding conversations had between an officer and defendant at the time of arrest; and (3) the trial court committed prejudicial error in failing to designate certain witnesses, as a matter of law, to be accomplices and to instruct in the language of section 1111 of the Penal Code as to the necessity of corroboration of their testimony. Our reading of the record leads us to the conclusion that no prejudicial error was committed, and that the judgment should be affirmed. (Const., art. VI, § 4½.)

With respect to Count Three, Mrs. Luella May Coon testified that, believing herself to be pregnant, she made an appointment with defendant and went to his residence on March 3, 1953, around 8 o'clock in the evening, and that Mrs. Black accompanied her. She was admitted to the front room by a woman. She told defendant of her belief in her pregnancy and told him that she "wanted to get rid of it." She paid the receptionist $350. She then removed her underclothes in the back bedroom and lay flat on her back on a table equipped with stirrups, into which she put her feet. Defendant entered the bedroom and started to make a pelvic examination. Mrs. Black remained with Mrs. Coon during the entire time. Mrs. Coon testified that she suffered such pain at the time defendant was working on her with his probing instruments that she cried out. Mrs. Coon then testified that defendant told her that if she was going to do that he could not go through with it "on account of the neighbors in back." Mrs. Black then told defendant to give back Mrs. Coon's money but defendant said nothing and went ahead. Defendant's receptionist gave her a hypodermic in her hip and a pill. Defendant told her that she could expect to flow three or four weeks later and that she should get in touch with him if she continued cramping and paining the way she did. Mrs. Coon was in defendant's treatment room about 30 minutes. Mrs. Coon further testified that she returned alone to defendant's residence about two weeks later. The same procedure was followed and she again suffered great pain. Mrs. Coon stated that she started to flow two weeks later, and that prior to her visit she had been in general good health and could have borne a child without injury to herself.

Mrs. Black, Mrs. Coon's companion, gave almost identical testimony, except, of course, as to what transpired subsequent to the first visit to defendant's residence. She also testified that she was present in the bedroom during the time that the alleged abortion was being procured, and that she knew what defendant was trying to do with the instruments. She testified that defendant entered the bedroom carrying the instruments in an old bucket, and that although she told the defendant that it would not be sanitary to use those instruments, he nevertheless used them. Mrs. Black testified that she held Mrs. Coon, "keeping her hands down because she kept clawing at him, trying to get away" when defendant, in trying to get her to bleed, used the instruments in a rough manner, which caused Mrs. Coon to suffer pain.

As to Count Two, Mrs. Ippolito testified that she believed herself to be pregnant, having missed a menstrual period. She testified that she previously had had a child; that she had been in general good health and could have borne a child without injury to herself. She went to defendant's residence on April 7, 1953, around 7:30 or 8 o'clock in the evening, and was accompanied by Mrs. Hart. She was admitted to the front room by a woman. She then spoke to a gray-haired man with glasses, the same one who examined her, and told him that she believed that she was pregnant because she had missed one of her menstrual periods. She told defendant that her divorce was not final, that she could not get married, that she had a very strict family "and if we went through with it we would be disgraced and very much humiliated." She paid defendant's receptionist $250. Mrs. Hart remained in the front room when Mrs. Ippolito went into the back bedroom. She then lay on her back on an operating table equipped with stirrups, into which she put her feet. Mrs. Ippolito testified that the gray-haired man used instruments in the pelvic examination, and that she felt pain, like a cramping pain. She was in the treatment room about 15 or 20 minutes. The receptionist told her that if she started to flow, to use a cold pack and stay in bed. Shortly thereafter, she started to flow.

Mrs. Hart testified that she accompanied Mrs. Ippolito to defendant's residence, and that they were driven there by Paul Cerrito, whom Mrs. Ippolito later married. She testified that defendant was the gray-haired man with whom Mrs. Ippolito had talked in the front room. She also testified that prior to the night in question Mrs. Ippolito had told

her that she thought she was pregnant but that she had not seen a doctor. Mrs. Hart thereafter phoned and made an appointment for Mrs. Ippolito, but 'did not say what the appointment was for. She did not accompany Mrs. Ippolito to the back bedroom, where the alleged abortion was performed.

Defendant admitted that he had made pelvic examinations of the two women and had used the surgical probing instruments identified by them, but he maintained that he did not perform any abortions, and that he merely examined them for pregnancy, which he did not find to exist in either case. A police officer, in the search of defendant's residence at the time of his arrest, found a small black notebook on the dining-room table. The notebook was properly identified and introduced in evidence. At the trial defendant was questioned about the entries under the dates April 7, 1953, and March 3, 1953. The entries appeared in abbreviated form; that is, the name of the person examined, followed by the numeral "8" and, following that, either "2½" or "3½." When asked if those entries did not mean that on the particular date those parties had appointments at the hour of 8 and paid $250, and $350, defendant answered, "possibly so." He at first denied that the entries were in his hand, but later was in doubt as to who had made them. He admitted that he probably received the $250 and $350 in advance, as was his custom, and he supposed that his nurse had made some financial adjustment with the two women after he had discovered that they were not pregnant. The records for the months in question were in the physical possession of his nurse, whom he had not seen since April 25, 1953. He stated that his patients would come to his office on an average of twice a week for prenatal care. Although defendant professed to know little about the aforementioned notebook and its entries, when asked if the book would show whether any patient had come to his office more than twice, he stated that it would not. He stated this without looking at the book, although he was given the opportunity to do so. Defendant's license did not permit him to sever or penetrate the flesh. He stated that his nurse must have acted on her own initiative when she gave Mrs. Coon the hypodermic, and that he didn't pay any attention to what she did.

Defendant contends that the court abused its discretion in denying his motion for a continuance of the trial, which was made on the day the case was called for trial. (Pen. Code,

§ 1050.) Defendant's motion was made on three grounds: that the continuance was necessary so that defendant might have access to certain records to prepare his defense; that because of illness and disability resulting from a broken leg, his counsel had been unable to adequately prepare the case for trial; and that counsel had only three weeks to prepare for trial which, under the circumstances, was not a reasonable length of time.

At the time of defendant's arrest, certain books and records were taken by the police. They were brought into court in response to a subpoena duces tecum. These documents were not made available to defendant at the beginning of the trial. Defendant was not permitted to examine them until after the close of the prosecution's case on July 21, 1953. Defendant testified on that day. There were no proceedings on the next day. On July 23, 1953, defendant resumed his testimony, and on that date the defense rested its case. In the meantime defendant had an opportunity to examine the documents in question. In the absence of another request for a continuance after examination of these books, it does not appear how defendant was prejudiced in the preparation of his defense. (*People* v. *Owens*, 132 Cal. 469, 471 [64 P. 770].)

With respect to the alleged illness of defendant's counsel, it does not appear there was an abuse of discretion in denying the motion. Defendant was arrested April 28, 1953. The day after his arrest, counsel obtained his release on bail. In the meantime, counsel had broken his leg but he had the preliminary hearing continued until May 19, 1953, at which time he had been released from the hospital. Counsel, despite his injury, continued to represent defendant at every stage of the proceedings. Counsel appeared at the arraignment, June 2, 1953. Counsel appeared again June 8, 1953, when a motion was made pursuant to Penal Code, section 995. Counsel appeared June 22, 1953, when the motion to dismiss the information was heard and denied. On the same date, defendant entered a plea of not guilty and trial was set for July 15, 1953. Defendant's counsel therefore had from June 22, 1953, to July 15, 1953, in which to prepare the case for trial. In view of the above chronology, it cannot be said that the trial court abused its discretion in determining that counsel's injury was not such as to deny defendant effective representation by counsel. Moreover, the period from June 22 to July 15, 1953, was not an unreasonably short length

of time in which to prepare a defense. (*People* v. *Dorman*, 28 Cal.2d 846, 850-852 [172 P.2d 686]; *People* v. *Anthony*, 90 Cal.App.2d 122, 134 [202 P.2d 776].)

Defendant next contends that the trial court committed prejudicial error in overruling his objection to the admission in evidence of conversations between an officer and defendant at the time of the arrest. The statements of the officer and defendant's responses thereto were offered as evidence of acquiescence by the accused in the truth of the statements made, that is, as tacit admissions.

Officer Zander testified that a conversation was had at the city hall immediately following the arrest. Officer Zander told defendant that he had been arrested on suspicion of having performed illegal operations; that an investigation of activities about his home had been going on for some time, and that on the day of his arrest several items of physical evidence had been picked up. He told defendant that the police were impartial in the matter, and that if defendant had any explanations he might desire to make, they desired to give him the opportunity to make them. Defendant stated that "he didn't think he would say anything, that he couldn't see where anything he could say would possibly do him any good." Officer Zander asked defendant: "You don't want to discuss this at all?" Defendant answered: "No, I don't want to discuss it."

Officer Zander then testified that he spoke to defendant of Hazel Slocomb, defendant's nurse, who had also been taken into custody. He related to defendant how they had talked to Mrs. Slocomb of the same matters, and how they had told her that they suspected her of assisting defendant in the performance of illegal abortions. Officer Zander told defendant that Mrs. Slocomb had denied any knowledge about illegal activity, to which defendant stated: "That's right, she didn't know anything about it."

The officer then testified that he told defendant that he (Zander) was going to make a formal statement. Officer Zander picked up a small, black notebook and stated to defendant: "Isn't it a fact, doctor, that this book is a record that was kept by you of the names of the women upon whom you have performed abortions, with notations indicating the dates upon which the abortions were performed and the amount of money that you received from these women for the performance of those abortions?" To which the defendant replied, "Okay."

The officer also testified to a subsequent conversation had at the "booking" office. While defendant was being "booked," he turned to Officer Zander and asked: "What am I being booked for, murder?" The officer answered: "Well, doctor, you haven't lost any girls lately, have you?" Defendant answered: "You know, I have never lost a girl in all my years of practice, either legally or illegally." Defendant made no objection to the admission in evidence of this subsequent conversation.

Defendant contends that this testimony was improperly admitted and relies on *People* v. *Simmons,* 28 Cal.2d 699 [172 P.2d 18], and *People* v. *Spencer,* 78 Cal.App.2d 652 [178 P.2d 520].

█ Defendant's responses to accusatory statements may find their way into the record only under the admission exception to the hearsay rule. If the accused person expressly admits the truth of the accusatory statement, both the statement and answer may be admitted. █ If the accused person expressly denies the accusatory statement, there is no admission. █ If the accused makes an evasive or equivocal reply which is not directly responsive to the accusatory statement, or remains silent, it has been held that under certain circumstances both the accusatory statement and the response are admissible. █ In any event, when the accusatory statement is admitted, it is not admitted as proof of the facts asserted in the statement. Such statements are admitted only to show the reaction of the accused. (4 Wigmore on Evidence (3d ed. 1940), §§ 1071, 1072, pp. 70-89.)

█ When the response to an accusatory statement consists of evasion, equivocation or silence, "It is for the court in the first instance to determine whether the import of the statements is such that it would furnish a foundation for proof of conduct, and it is then for the jury to decide whether the accused was aware the statements were made, whether, under all the circumstances shown, they called for a disclaimer, whether the accused did reply to them, and whether if he did not do so, such failure showed criminal intent or a consciousness of guilt." (*People* v. *Yeager,* 194 Cal. 452, 486 [229 P. 40]; *People* v. *Simmons, supra,* 28 Cal.2d 699, 713, and cases cited therein.)

In the Simmons case, defendant's course of conduct throughout the interrogation by the police officers was such that this court concluded that replies repeatedly made by defendant to the coercive questioning indicated an obvious

intention to take advantage of the privilege against self-incrimination. (*People* v. *Simmons, supra,* 28 Cal.2d 699, 716-721.) As this court stated (p. 716): "Obviously, when a defendant repeatedly asserts, as did the defendant here, 'I have told you all I am going to tell you,' and is repeatedly pressed by police officials into further conversation, his response is not a free and spontaneous one. It is made under mental, if not physical coercion, exercised by the police officials. . . ." ▮ Moreover, if a defendant's silence or refusal to discuss the accusation is the result of a well-considered decision by him, it cannot logically be said that his silence or refusal to discuss the matter indicates an acquiescence in the truth of the accusation.

▮ The circumstances of compulsion and implied coercion which were present in the Simmons case are not present here. Defendant was not repeatedly pressed into conversation after repeated denials. Although at one point defendant stated that he did not want to discuss the circumstances of his arrest he never reasserted his disinclination to talk. On the contrary, when advised that his nurse had denied any knowledge of illegal activity, defendant stated: "That's right, she didn't know anything about it." And, when the officer accused defendant of keeping a notebook record of his illegal operations, defendant replied, "Okay." Still later, defendant made the incriminating statement that he had never "lost any girls . . . either legally or illegally." This latter remark of defendant was prompted by defendant's own question to the officer. In the light of these conversations, it is plain that defendant had not adopted a policy of silence.

Another factor which was deemed important in the decision of the Simmons case was that accusatory statements are often contained in a lengthy statement which is read to or by the defendant. Thus, under the cloak of an accusatory statement, a great amount of testimony which is otherwise inadmissible is placed before the jury and may influence it even though cautionary instructions are given. (*People* v. *Simmons, supra,* 28 Cal.2d 699, 717 et seq.) The accusatory statements by Officer Zander were in no sense lengthy. The statement regarding the black notebook contained nothing which was not brought out by the cross-examination of defendant. Thus, one of the main bases of the Simmons decision does not exist in the present case.

Here, it was for the jury to weigh the responses of defendant and decide whether or not they gave rise to an inference of

guilt. ▉ The jury was properly instructed that evidence of an accusatory statement was "not received for the purpose of proving its truth, but only to explain the conduct of the accused in the face of it." ▉ It cannot be said, under the circumstances presented here, that the trial court erred in admitting the accusatory statements and defendant's responses thereto.

Defendant also contends that the court committed prejudicial error in failing to instruct the jury, of its own motion, that Mrs. Black and Mrs. Hart were accomplices as a matter of law, and that "a conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense." (Pen. Code, § 1111.)

▉ An accomplice is one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given. (Pen. Code, § 1111.) ▉ Whether or not Mrs. Hart and Mrs. Black were accomplices within the meaning of section 1111 depends upon whether or not they had aided and abetted in commission of the crime charged, or, not being present, had advised and encouraged its commission (Pen. Code, § 31), or had conspired to procure the abortions (Pen. Code, § 182). And the instruction that Mrs. Hart and Mrs. Black were accomplices as a matter of law could be given only if undisputed evidence established the complicity. (*People* v. *Wallin,* 32 Cal.2d 803, 809 [197 P.2d 734]; *People* v. *Ferlin,* 203 Cal. 587, 601 [265 P. 230]; *People* v. *Coffey,* 161 Cal. 433, 436 [119 P. 901, 39 L.R.A.N.S. 704].)

▉ The court gave defendant's instruction that "one who brings a woman to a doctor for the purpose of obtaining an unlawful abortion upon her is an accomplice as a matter of law" and an instruction regarding the credibility to be accorded accomplice testimony. This instruction left the question of complicity to the jury and, therefore, did not constitute an instruction that Mrs. Black and Mrs. Hart were accomplices as a matter of law.

▉ Therefore, as to Mrs. Black the court erred in failing to instruct the jury that she was an accomplice as a matter of law. Her testimony shows that she knew that the crime here charged was being committed by defendant, and that she actively cooperated in accomplishing the result. She aided and abetted in the commission of the offense. (Pen. Code, § 31),

and consequently was an accomplice within the meaning of section 1111 of the Penal Code.

However, the court did not err in failing to instruct the jury that Mrs. Hart was an accomplice as a matter of law. Her undisputed testimony shows that she arranged an appointment with defendant for Mrs. Ippolito, but that she did not state the purpose of that appointment. There is no testimony to the effect that she knew at that time that it was Mrs. Ippolito's design to procure her own abortion. Beyond that,. her only further act was that of accompanying Mrs. Ippolito to defendant's residence. There is no direct testimony to the effect that Mrs. Hart had advised and encouraged defendant in the commission of the offense, nor that there had been a conspiracy to procure an abortion; and the mere accompaniment of a victim of abortion to defendant's residence, although realizing at that time the victim's purpose in going there is to obtain an abortion, does not necessarily make the companion an accomplice. (*People* v. *Balkwell,* 143 Cal. 259, 261 [76 P. 1017]; *People* v. *Brewer,* 19 Cal.App. 742, 746 [127 P. 808]; *People* v. *Seiffert,* 81 Cal.App. 195, 198 [253 P. 189]; see *People* v. *Wilson,* 25 Cal.2d 341, 346 [153 P.2d 720].) Therefore, the court properly left the question as to Mrs. Hart's complicity to the jury. Defendant's requested instruction as given was more favorable to him than authority justifies, and he may not be heard to complain of the court's favorable charge.

It follows, however, that the court erred in failing to give an instruction as to the necessity of corroboration of accomplice testimony. Such an instruction should accompany appropriate accomplice instructions; and it does not suffice, as was done in the present case, to give an instruction regarding the credibility to be accorded to the testimony of an accomplice. More important than the weight to be given to accomplice testimony is the consideration of whether or not that testimony may be considered at all for the purpose of conviction. Without first finding corroboration of an accomplice's testimony, credibility need not be considered.

None of the above-mentioned instructions was requested. Nevertheless, the failure of the trial court to give them of its own motion was error. "It is incumbent upon a court in a criminal case to instruct the jury of its own motion, charging them fully and fairly upon the law relating to the facts of the case." (*People* v. *Putnam,* 20 Cal.2d 885, 890 [129 P.2d 367].) The rule obtains in proper cases,

such as this one, and requires the giving of accomplice and corroboration instructions (*People* v. *Warren*, 16 Cal.2d 103, 117-119 [104 P.2d 1024]; *People* v. *Heddens*, 12 Cal.App.2d 245, 247 [55 P.2d 230]); and particularly where, as here, although recognizing the necessity of giving such instructions, the trial court gave only part of the required instructions (*Cf. People* v. *Baker*, 42 Cal.2d 550, 575-576 [268 P.2d 705]), that is, the instruction regarding the credibility to be accorded to accomplice testimony.

Although we have concluded that the trial court erred in failing to instruct the jury upon the law relating to the testimony of accomplices and the necessity of corroboration, we cannot conclude that the error was prejudicial. Reviewing courts will scrutinize with great care any claim of prejudicial error predicated solely upon the omission of the trial court to give of its own motion an instruction, the propriety of which is indicated solely by the condition of the evidence. ▆▆▆ Prejudicial error will be held to exist if, upon an examination of the entire record (Cal. Const., art. VI, § 4½; *People* v. *Warren, supra,* 16 Cal.2d 103, 119), it appears that the giving of the instructions was vital to a proper disposition of the case. Such was the state of the record in *People* v. *Warren, supra,* 16 Cal.2d 103, and *People* v. *Heddens, supra,* 12 Cal.App.2d 245. The record in each of those cases disclosed that the only testimony tending to implicate the appealing defendant was accomplice testimony. Therefore, the omitted instructions were there vital to a proper disposition of the case. If the jury had been properly instructed concerning accomplices and the necessity of corroboration, the jury might have found that the party testifying was in fact an accomplice and, since there was no corroboration, would have been required to acquit. Such, however, is not the state of the present record. ▆▆▆ Moreover, it has been frequently held that there is no prejudicial error where the record contains ample evidence to support the judgment without consideration of the testimony of the accomplice. (*People* v. *Robinson,* 110 Cal.App.2d 415, 418 [242 P.2d 676]; *People* v. *Burton,* 91 Cal.App.2d 695, 712 [205 P.2d 1065]; *People* v. *Sourisseau,* 62 Cal.App.2d 917, 931-932 [145 P.2d 916].) Such is the state of the record in this case.

▆▆▆ The court properly instructed the jury that defendant could not be convicted upon the uncorroborated testimony of a victim of abortion (Pen. Code, § 1108), and it properly delineated the evidence to which the jury might look for the corroboration.

The individual testimony of each victim, which has been summarized above, is sufficient, if corroborated, to support the verdict and judgment of conviction as to each count; and that testimony is amply corroborated. Either one of the women upon whom an abortion was performed can act as a corroborating witness with respect to matters which she may have observed that are relevant to the other count charging the performance of an abortion upon the other woman. (*People v. Gallardo*, 41 Cal.2d 57, 63 [257 P.2d 29].) The independent testimony of the two victims of abortion is mutually corroborative in that it shows that both abortions were committed in a similar manner following the same procedure. (*People v. Gallardo, supra; People v. Kendall*, 111 Cal.App.2d 204, 210-211 [244 P.2d 418].) The abortions were performed at defendant's residence, at night, in the back bedroom; the victims were admitted into the house by a woman; each victim lay on her back upon an operating table equipped with stirrups, into which she put her feet; the defendant used instruments; probing caused the victims great pain; payment for the services was made to the receptionist; and the entire transaction took from 15 to 30 minutes. In addition, sufficient corroboration is furnished by the defendant's own testimony and inferences therefrom. (*People v. Wilson, supra*, 25 Cal.2d 341, 347; *People v. Sullivan*, 144 Cal. 471, 473 [77 P. 1000]; *People v. Griffin*, 98 Cal.App.2d 1, 25 [219 P.2d 519]; *People v. White*, 48 Cal.App.2d 90, 95 [119 P.2d 383]; *People v. Watson*, 21 Cal.App. 692, 697 [132 P. 836].) Such corroboration may be found in his responses to the accusatory statements and in the fact that much of his testimony closely paralleled that of the two victims except, of course, that in his version his acts constituted only examinations for pregnancy. (*People v. Garner*, 60 Cal.App.2d 63, 65 [140 P.2d 146].)

 We have therefore concluded that the trial court's failure to instruct properly regarding accomplices and the necessity of corroboration of accomplice testimony did not constitute prejudicial error, warranting a reversal. (Const., art. VI, § 4½.) Section 1111 of the Penal Code is directed at preventing a conviction based upon the uncorroborated testimony of an accomplice. The court in its instructions to the jury subordinated the testimony of Mrs. Hart and Mrs. Black to the role of testimony corroborative of the testimony of the aborted women. The court instructed the jury, as to Count

Two, that the defendant might not be found guilty of the crime charged in that count upon the uncorroborated testimony of "Susan Ippolito" (the allegedly aborted woman); and it instructed that the necessary corroboration might be supplied by the testimony of "Frances B. Hart." The same instruction was repeated as to Count Three with respect to the testimony of "Luella Mae Coon" (the allegedly aborted woman), and the corroboration which might be found in the testimony of "Beulah Black." In the face of such instructions the jury could not reasonably have rejected the testimony of the aborted women and convicted solely upon the testimony of the alleged accomplices.

The judgment and the order denying the motion for a new trial are affirmed.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., and Schauer, J., concurred.

EDMONDS, J.—In my opinion, the circumstances relied upon by Davis as establishing an abuse of discretion in the denial of his motion for continuance are not so compelling as those shown in *People* v. *Dorman*, 28 Cal.2d 846 [172 P.2d 686]. I, therefore, concur in the judgment.

Appellant's petition for a rehearing was denied December 29, 1954.