[Crim. No. 4008.   Second Dist., Div. One.   Aug. 7, 1946.]

THE PEOPLE, Respondent, v. FRANK RUBIO, Appellant.

Leola Buck Kellogg and Montgomery G. Rice for Appellant.

Robert W. Kenny, Attorney General, and Henry A. Dietz, Deputy Attorney General, for Respondent.

WHITE, J.—In an information filed by the District Attorney of Los Angeles County, defendant was charged with the murder of one Henrietta Valdez. Following trial before a jury he was convicted of murder in the first degree, with the penalty fixed at imprisonment in the state prison for life. A motion for a new trial was denied. From the judgment of conviction and the order denying his motion for a new trial defendant prosecutes this appeal.

The record discloses that about 5 o'clock on the morning of August 24, 1945, the dead body of Henrietta Valdez was found by deputy sheriffs of Los Angeles County lying in the roadway of Brooklyn Avenue, a main thoroughfare running easterly through and out of the city of Los Angeles. The body was facing north, with the feet south, approximately eight feet south of the center line of the highway. There was blood on the road around the body and skid marks of an auto tire. However, it does not appear that the vehicle which made these marks had passed over the body. The skull had been severely crushed, and the body was brush-burned or abraided as if it had been dragged or pushed over a rough surface. An examination of the body revealed that two bullets had passed completely through the abdomen and thorax, entering low on the left side and exiting at a higher point on the right side. The chief autopsy surgeon of the Los Angeles County Coroner's office testified that an autopsy performed by him revealed the victim to be a woman approximately thirty years of age; that the contusions and brush-burns extended over the right side of the front of the body, the upper areas of the back, and the right side back of the pelvis and lower spine, as well as extensively over the right side of the face and forehead; that there was a multiple fracture of the ribs, the liver was ruptured, and the skull fractured. The immediate cause of death was internal hemorrhage due to gunshot wounds of the abdomen.

In answer to the question, "Was there anything that you found in this examination which would indicate to you from your examination any of these matters that these two bullet wounds might have been inflicted while the deceased was sitting in the right-hand seat of the automobile involved by a person who was sitting to her left, or the left-hand seat of the automobile?" the chief autopsy surgeon testified, "The position of the course of the wounds in the body does not necessarily indicate the position of the body at the time of

receiving those wounds or the position of the gun in delivering those wounds. I could not make a positive statement as to that." Replying to the question, "It could have been inflicted in that way?" the witness stated, "It could have been inflicted in that way . . . the wound through the body did not indicate any definite position of the body." The autopsy surgeon also testified that "there was no evidence of powder marks on the wounds, but that might be due to the presence of clothing. Whether there were powder marks on the clothing I don't know." An examination of the blood in the body of the deceased indicated the presence of "0.18 percent of alcohol. The generally accepted figure for intoxication is .15."

The defendant, a man 65 years of age, first met the deceased in a Los Angeles cafe about 1940, and approximately a year later they commenced living together, which they continued to do for over three years. Some six or seven months prior to the homicide, according to the defendant's testimony, they separated, because of her excessive drinking. Following such separation, however, defendant rented an apartment in an auto court, which, the proprietor testified, both occupied until August 2, when he requested them to vacate because they made too much noise. The defendant, however, testified that while the deceased was living in the auto court he "didn't stay many times with her because she was a sick woman"; that he did call upon her and bring her something to eat. He further testified that during this period he slept in his poolroom for a couple of months and thereafter stayed at the the home of a Mr. and Mrs. Paiz, the latter of whom was a sister of defendant and both of whom corroborated him in regard to his staying at their residence. It is conceded that on the date prior to the homicide defendant was living at the Paiz residence.

We deem it a fair statement to state that notwithstanding defendant's objection to the deceased's over-indulgence in alcohol during the latter months of her life, the two were apparently on friendly terms. They often had breakfast together, sometimes at the Garcia house, and other times at a cafe. They had supper usually at the Garcia home, to which place defendant would bring food for preparation and consumption. After supper defendant would go down to his poolroom and deceased would visit with the people in the Garcia home until 8 or 9 p.m., when defendant would call for her. There was also testimony that for some fifteen

months prior to her death deceased, accompanied by defendant, would call every Sunday at the home of the former's sister, who was rearing the 15-year-old daughter of deceased, and would take the girl to the theater. There was no direct or positive evidence that defendant had ever been unfriendly with the deceased or that he had threatened or mistreated her. There was no evidence that defendant would profit, financially or otherwise, through her death.

We come now to a consideration of the whereabouts and conduct of defendant and deceased during the 24 hours immediately preceding her demise. Defendant operated a poolroom at 3404 Ford Avenue, Los Angeles. It was his custom to open his place of business between 10 and 12 o'clock in the morning and to close it between 10 o'clock p. m. and midnight. He drove and constantly used a 1938 Chevrolet coupe, which was registered to his son, Frank Rubio, Jr. Deceased also had a key to the automobile. On the morning of August 23 defendant walked from the home of his sister, Mrs. Paiz, to his poolroom, a distance of some four blocks, arriving there between 9:30 and 10 o'clock. He did not, however, unlock the door to his poolroom, having met the deceased at the front thereof. After greeting each other, they repaired to a Mrs. Santoya's house, where the deceased was to have breakfast. Finding no food in the house, defendant walked to his apartment, obtained his automobile, and about 11 o'clock returned to the Santoya house with groceries. At that time defendant and deceased agreed to have supper together, whereupon defendant drove to his poolroom, opening it around 1 o'clock. About 5 o'clock that afternoon defendant drove back to the Santoya house in search of the deceased, but was informed by Mrs. Santoya that deceased was not there. Defendant thereupon went back to his poolroom, returning to the Santoya home between 8:30 and 10 p. m., when he was again informed that the deceased was not there. Going back to his pool hall, he remained there until about 11 p. m., when he closed his place of business, went across the street for a soft drink, and returned to his parked automobile, where he encountered deceased in what he described as an intoxicated condition. According to defendant's testimony, the following ensued:

"Q. What conversation did you have with her there? A. She wanted me to take her over to have some supper, and I turned around and looked at her, and I said, 'You are pretty drunk.

I don't want to bother with you when you are drunk.' And I got in the car and drove away and left her standing on the curb.

"Q. When was the next time you saw her? A. I never seen her any more.

"Q. Never saw her after that? A. No, sir, that was the 23rd, at night.

"Q. When you drove away what was she doing? A. Well, I drove away, and at that time I had some clothes I wanted to take home, I had a suit of clothes in there, and I turned around the block, and when I was ready to get off the car I heard some voice say, 'Here comes that woman again,' and I didn't know who it was, and I turned around, and I don't know if I seen her or not. Anyhow, I got in the car and went home."

Defendant further testified that he arrived at his sister's home where he was living at 11:45 p. m.; that after greeting the family, he immediately retired, and arose about 7:30 o'clock the following morning, had breakfast, and drove to his poolroom, where he arrived about 10 a. m. As to his arrival home and retiring, defendant was corroborated by the testimony of Mary Paiz, who was sitting up with a sick child, and who testified that she admitted defendant to the house. Isabel Paiz, whom defendant requested to iron some shirts for him on the following morning, also testified as to the time of his arrival home and retiring. Mrs. Leon, a neighbor, testified she saw defendant arrive at the Paiz home shortly before midnight.

The foregoing constitutes all of the direct evidence bearing upon the whereabouts of the defendant on the night preceding and the early morning of the homicide. The mortician to whose establishment the body of the deceased was removed, testified that death occurred "at least two or three hours" prior to the time of the examination by him at 8 a. m. to determine how long she had been dead.

In statements made to deputy sheriffs on August 25, the day after the homicide, defendant said that on the night of August 23, when he encountered deceased leaning against his automobile, she "cussed" him when he refused to take her to supper; that all he was trying to do was get away from her because "it did not please me to see her drunk"; that he "blew up"; that it "burned me plenty"; that it "made me so mad when I seen her." In a stenographic statement taken

from the defendant by deputy sheriffs on August 25 and introduced in evidence, we find the following:

"Q. Has Henrietta Valdez ever threatened you in any manner? A. I don't know the word.

"Q. I mean threatened—— A. I don't know the meaning of the word.

"Q. By 'threatening' I mean has she ever told you that she will expose you for any particular reason to the law? A. She told me a long time ago because when we separated she wanted to come back to me and she told me that she was going to report me and do me all the harm in the world.

"Q. What did Henrietta say she was going to report you for? A. Well, everything—— that I killed a man in Arizona, and that I had run a gambling house, doing this and doing that.

"Q. About how long ago was it that Henrietta threatened to expose you for killing a man in Arizona? A. Couple of months, three months ago.

"Q. And was there any one present besides you and Henrietta at that time? A. I don't remember. I don't think there was.

"Q. Where did that conversation take place? A. Right in front of the pool hall. She always would come to the pool hall hollering and bothering me; hollering in there, 'I am going to put you in jail. I am going to do all the harm I can for you.' That is when she told me—— I said, 'Why you going to report me for? Have I done anything wrong for you? I always did the best for you I could. I lost my house and lost my furniture and everything, and then you try to get me in trouble.' Then the answer she gave me that time—— there was a woman in front there, both got together—— and she told me, she says she was going to try to do all the harm she could to get me out of the neighborhood, because they were afraid of me.

"Q. What was that woman's name that Henrietta said that to? A. Well, the woman wasn't there at the time. She was along. She was right in front. I could just look through the window and look at the two persons together there.

"Q. I think you said that was a place where there was considerable colored people? A. Yes.

"Q. Well, Henrietta was bothering you considerably over the last period of—— the last couple of months, was she not? A. I guess she wasn't bothering me when sober.

"Q. Was she drunk this last Thursday morning at 10:00 o'clock when she came over and asked you to take her over to Angelina's house? A. Well, not very badly, but I could see she had a few drinks in her."

While testifying as a witness in his own behalf, defendant stated that during the six or seven months prior to the homicide he had seen the deceased intoxicated almost every night; that he told her to "cut down the drinking," which she refused to do; that after they had separated deceased "kept looking for me and talking to me"; sometimes intoxicated and sometimes sober; that she was "always" asking him for money, which he would give her when she was sober, but refused when she was intoxicated; that when he refused to give her money while she was under the influence of liquor "she would cuss and tell me all kinds of words."

The record reflects that on the night preceding her death deceased was observed by Amelia Santiago between 8 and 9 p. m., sitting in defendant's automobile in front of his pool hall; that her nose was bleeding and she was holding a handkerchief to her nose. Because deceased was intoxicated, Mrs. Santiago merely greeted her and went away.

Another witness, Mrs. Ramirez, testified that on the same night, some time after 11:30 o'clock, she was waiting for a bus at Brooklyn Avenue and Ford Street, when deceased ran across the street with a man running after her "who wanted to teach her to smoke marihuana"; that she finally separated deceased from this man, and let a bus go by, whereupon she and deceased went to the cafe of a Mrs. Lopez for some Mexican food, arriving there about 1:30 a. m. Mrs. Ramirez had previously noticed that deceased's lip was swollen and "somewhat on her nose." Mrs. Lopez, the cafe proprietor, noticed blood on the deceased's face or sweater and stated that neither deceased nor her companion was intoxicated, and that they departed from her place about 1:50 a. m. on the morning of August 24. After leaving the cafe, deceased and Mrs. Ramirez returned to the corner of Brooklyn Avenue and Ford Boulevard, where deceased sat on the curb. They remained there until about 2 a. m., when Mr. Arias, an acquaintance of Mrs. Ramirez arrived, stopped his automobile and all three had a drink of whiskey from a bottle produced by Mrs. Ramirez. Mr. Arias thereupon took Mrs. Ramirez home, the deceased refusing to go because she was waiting for the defendant. After taking Mrs. Ramirez home, Mr.

Arias returned to where he had left the deceased and observed her sitting on the curb near the pool hall. While his testimony is somewhat confused, he does positively state that the deceased said she was waiting for the defendant. This witness also testified that at this time the deceased was very drunk.

The defendant owned a pearl-handled, 38-caliber revolver, which he had a permit to carry, and which he constantly carried with him in a holster to and from his pool hall. He had this revolver loaded, with him on the night of the 23d of August when he claims he last saw deceased, and he had it in his possession on the morning of the 24th of August, when he took it to his pool hall. The revolver was found at the pool hall about 10 o'clock on the morning of the 25th of August, loaded with five shells. Defendant stated that he had last fired this weapon on the 22d of August in the hills, at which time he fired it three times; that he had cleaned the gun prior to this firing, but did not clean it afterward. Expert testimony was introduced by the People that the last time the weapon had been fired it had been fired in his opinion two times only; but the witness did admit that the weapon could have been fired more than twice. He also testified that the weapon had been cleaned since it had been last fired. Another expert witness for the People testified that the bullet wounds on the body of deceased were made by 38-caliber bullets fired at very close range, probably not more than two inches from the body, the lower entrance wound scorching the skin, but not the upper one, it having gone through the left-hand side of a sweater and brassiere, whereas the lower bullet was "probably fired without having gone through any cloth." A defense expert witness testified that there was no way of positively identifying the caliber of the bullets which caused the wounds.

An examination of defendant's car disclosed a fingerprint of the deceased on the rear view mirror; that there was a dent on the inside of the right-hand door that was made by an object the size of a 38-caliber bullet; that this dent had three times as much lead in it as the surrounding area, and that there were striations in the area which indicated the bullet was traveling upward. There was also testimony that the seat cover had been washed and had upon it human blood, which was type "O," this being the classification into which the blood of deceased fell. There was also testimony that

there were human bloodstains on the apron of the car. The defense produced an expert witness who testified that from his examination there was no reason to believe that the dent was made by a 38-caliber bullet. After his arrest defendant, in talking to a deputy sheriff, stated ''If you find any blood on that car I am guilty.'' He explained this at the trial by saying that he was sure there was no blood on the car.

On this appeal a reversal is urged by appellant on three grounds: (1) That the evidence is legally insufficient to sustain the conviction; (2) that one of the instructions given was prejudicially erroneous, and (3) that there was no evidence of sufficient substantiality to establish that the homicide constituted murder.

██  It is conceded that the deceased met her death through criminal means. While contending that the evidence is legally inadequate to prove that the crime charged was murder, appellant does concede that the death of the deceased was occasioned by criminal homicide, in that her life was unlawfully taken by another through criminal violence. Appellant challenges the sufficiency of the evidence to establish legally the fact that the crime was perpetrated by him. We are therefore confronted, first, with the question of whether, upon any hypothesis whatever, there is sufficient substantial evidence to support the conclusion reached in the court below. It is not a question of whether the circumstances relied upon to justify the verdict of the jury might in the opinion of the reviewing court be reasonably reconciled with the innocence of the defendant; but to justify interference by us with the determination of the jury in the first instance and the trial judge on hearing of the motion for new trial, we must be able to say that the evidence obviously does not warrant the inference of guilt. (*People* v. *Newland*, 15 Cal.2d 678, 681, 682 [104 P.2d 778].) We must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence and then determine whether such facts are legally sufficient to support the verdict. ██  An appellate court may set aside the findings of the trial court only when there is no substantial or credible evidence in the record to support them, or where the evidence relied upon by the prosecution is apparently so improbable or false as to be incredible, or where it so clearly and unquestionably preponderates against the verdict or decision as to convince the appellate court that its rendition was the result of passion

or prejudice upon the part of the duly constituted triers of fact. When a case presents any of these features, this court deals with it as a matter of law. Experience teaches that such a situation can be presented only in exceptional cases.

In the case with which we are here concerned the prosecution relied solely upon circumstantial evidence, except for a statement made by the defendant to deputy sheriffs and to which we have alluded. The circumstantial evidence was sharply contradicted by direct evidence introduced by the defendant. ■ The law makes no distinction between direct and circumstantial evidence in the degree of proof required for conviction, but requires only that proof of guilt be established beyond a reasonable doubt by evidence of the one character or the other, or both. ■ Therefore, if the circumstances relied upon by the prosecution reasonably justify an inference of guilt, but an inference of innocence might also reasonably have been drawn, it was for the jury, as between these two inferences, to choose, and unless it is obvious that the evidence does not warrant the inference of guilt adopted by the jury, this court is powerless to interfere. ■ And where the inference of guilt is negatived by positive and direct evidence in contradiction thereof, that too presents a question for the triers of fact, who may, if they conscientiously choose to do so, reject the direct and positive testimony opposed to that from which the inference of guilt may reasonably be drawn. In such a situation we may not substitute our own judgment of the value and effect of such evidence and the credibility of witnesses for that of the jury unless we can say that the evidence is of such a character as to amount to no evidence at all.

■ In the instant case we are confronted with a situation wherein the external manifestations of the defendant do not indicate a feeling of hostility toward the deceased, but nevertheless there was evidence that from the time of the disagreement between defendant and the deceased in February, 1945, the latter was constantly harassing and annoying the former; that the deceased, over the protests of defendant, frequently became intoxicated and on these occasions demanded money from him, and when he refused such demands she would curse him, sometimes in the presence of others. According to the defendant himself, the deceased threatened him and was going to "report" him for killing a man in Arizona, and that he "had run a gambling house . . ."; that "she always

would come to the pool hall hollering and bothering me, hollering in there, 'I am going to put you in jail. I am going to do all the harm I can for you.' " The defendant said to the deceased, "Why are you going to report me for? Have I done anything wrong for you? I always did the best for you I could. I lost my house and lost my furniture and everything, and then you try to get me in trouble." While he continued to see the deceased and provide for her, the defendant was anxious to get away from her, and the situation in which he found himself with her, according to his testimony, made him angry. We refer to this evidence because of appellant's argument that there is an entire absence of any evidence showing any motive on his part which would prompt him to take the life of the decedent. While on innumerable occasions the Supreme Court and District Courts of Appeal of this state have held that proof of motive in the commission of the crime of murder is not essential to sustain a judgment of conviction, nevertheless there are cases holding that this rule is applicable only where the perpetration of the act charged is brought home to the defendant by sufficient evidence, and that where the identity of the defendant as the person who committed the crime is a fact in dispute evidence of a motive of the defendant to commit the crime, while not essential, does assume materiality. Also, where the evidence relied upon to connect the defendant with the commission of the crime is entirely circumstantial, proof of motive may assume some importance.

In addition to the foregoing, the record reflects that late in the evening of the day preceding her demise the deceased was observed by the defendant leaning against the automobile, waiting for him in front of his pool hall. At that time he was armed with his .38-caliber revolver; she was intoxicated and demanded money. He refused to talk with her, take her to supper, or give her any money. She swore at him in the presence of other people, and according to the defendant, all he desired was to get away from her. He was angry; he drove away, and later returned to the same vicinity, but believing the deceased was intent upon seeing him, he drove off again. True, the defendant and some of his relatives and neighbors testified that he went home, retired to bed and remained there all night, but this, as heretofore noted, created a conflict with contrary inferences deducible from other facts and circumstances established in

evidence. The evidence also discloses that deceased during the early morning hours of August 24 remained in the vicinity of appellant's poolroom, talked with several people, and resisted their urgings to leave the vicinity because she was waiting for appellant. There was testimony that the fatal bullets were fired at close range. Upon appellant's automobile human bloodstains of the same type as decedent's were found. This fact, it is true, was explainable because before midnight the deceased was observed sitting in the vehicle with her nose bleeding, but an incriminating circumstance was the fact that the automobile was washed in an effort to remove the bloodstains therefrom. There was a dent in the right-hand inside portion of the door, which it was testified was made by an object the size of a .38-caliber bullet. An expert witness for the prosecution testified that defendant's revolver had been cleaned since it was last fired and that upon the occasion when it was last fired it was fired but twice. Both the .38-caliber revolver and the automobile were at all times in the possession and under the control of the defendant, although the deceased had keys to the automobile. During the time he was questioned by deputy sheriffs, appellant stated that if blood were found on the automobile he was guilty. In view of the fact that the seat of the vehicle had been washed, this statement assumes some significance.

In the light of the foregoing circumstances, we are not warranted in saying that there is no substantial evidence to support the verdict; or that the evidence relied upon by the prosecution is apparently so improbable or false as to be incredible, or that it so clearly and unquestionably preponderates against the verdict as to convince this court that its return was the result of passion or prejudice on the part of the jury. The instant case shows the usual and ordinary situation where the evidence, circumstantial on the side of the prosecution and direct on the side of the defense, was conflicting as to the vital question in the case—and the jury's finding against the defendant, being supported by material evidence, is conclusive upon this court.

█ Appellant challenges the correctness of one of three instructions given as to the proof required in cases where the evidence is circumstantial. We do not deem it necessary to here set forth the three instructions given. When considered in their entirety and in conjunction with each other and all other instructions, the three on circumstantial evidence clearly

and understandingly admonished the jury that before they could convict the defendant of murder they must be convinced beyond a reasonable doubt by direct evidence, circumstantial evidence, or both, that the defendant wilfully, unlawfully, feloniously and with malice aforethought murdered Henrietta Valdez. The jury was instructed that while the law makes no distinction between direct and circumstantial evidence in the degree of proof required, "nevertheless the circumstances relied upon to establish the guilt of one accused of crime must be consistent with that hypothesis and inconsistent with any other rational conclusion." The jury was also instructed that "under the law no jury should, nor has it the right to, convict a defendant of a crime upon mere suspicion, however strong, nor simply because there may be some evidence in the case against him; nor merely because there is or may be strong reason to suspect that he is guilty, but before a jury can lawfully convict they must be convinced of the defendant's guilt beyond all reasonable doubt."

From a reading of all the instructions given, we are impressed that the trial judge fully and fairly advised the jury as to the kind, quality and degree of proof necessary before appellant could be convicted. That is all the law requires. (*People* v. *Curtis,* 36 Cal.App.2d 306, 322 [98 P.2d 228].) ▮ Furthermore, the challenged instruction was given at the request of the defendant himself, and the law is well settled that an appellant cannot complain of instructions given at his own request. (*People* v. *Curtis, supra,* p. 321.) Were it otherwise, a defendant could purposely mislead the court and thereafter take advantage of his own deception.

▮ Finally, appellant urges that the evidence is insufficient to support a conviction of murder. Under the facts hereinbefore narrated, it must be held that if the jury was warranted in finding that the deceased was killed by the defendant, the killing was accompanied with that deliberation and malicious intent which characterizes the crime of murder.

For the foregoing reasons, the judgment and the order denying defendant's motion for a new trial are, and each is, affirmed.

York, P. J., and Doran, J., concurred.

A petition for a rehearing was denied August 16, 1946, and appellant's petition for a hearing by the Supreme Court was denied September 5, 1946.