[Crim. No. 2082.   Third Dist.   May 6, 1949.]

THE PEOPLE, Respondent, v. DON BURTON et al., Appellants.

Harold Wyatt, Maxwell M. Willens, Irving Sugarman and Hanna & Morton for Appellants.

Fred N. Howser, Attorney General, Doris H. Maier, Deputy Attorney General, and James O. Reavis for Respondent.

THE COURT.—Defendants Burton, Martin and Sugarman were prosecuted upon an indictment containing nine counts, which may be summarized as follows:

Count 1. Burton, Martin and Sugarman were charged with conspiracy to commit grand theft of $15,550.59 from the Phoenix Assurance Company on or about March 1, 1946.

Count 2. Burton, Martin and Sugarman were charged with grand theft of said amount from said company on or about said date.

Count 3. Burton and Martin were charged with conspiracy to commit grand theft of $12,827.06 from the same company on or about October 25, 1946.

Count 4. Burton and Martin were charged with grand theft of a like amount from the same company on or about the same date.

Count 5. Burton and Martin were charged with conspiracy to commit grand theft of $6,716.57 from St. Paul Fire and Marine Insurance Company on or about the same date.

Count 6. Burton and Martin were charged with grand theft of said amount from the same company on or about the same date.

Count 7. Burton and Martin were charged with conspiracy to commit grand theft of $2,029.61 from Connecticut Insurance Company on or about February 19, 1947.

Count 8. Burton and Martin were charged with grand theft of said amount from that company on or about the same date.

Count 9. Sugarman was charged with violation of section 556 of the Insurance Code on or about February 28, 1946.

It thus appears that counts one and two alone pertain to all of the three defendants, counts three to eight, inclusive, pertain to Burton and Martin, and count nine charges defendant Sugarman alone.

Burton filed a written motion to set aside the indictment upon the ground that he had been committed without reasonable probable cause. Sugarman filed a motion to quash the indictment on the grounds that it was void and that the court was without jurisdiction to proceed in that there was no evidence before the grand jury tending to support the charge in said indictment against him. Martin filed a like motion to set aside a like indictment on the ground that it was void in that the court was without jurisdiction to proceed because there was no evidence before the grand jury tending to support the charges against him and on the further ground that the indictment was not found, endorsed and presented as prescribed in section 940 of the Penal Code. After argument the motions were submitted and denied by the court. Separate demurrers were thereafter filed on behalf of each defendant and were denied. Thereupon each of the defendants entered pleas of

not guilty to the crimes as charged. Writs were then sought in this court to restrain the trial in the Superior Court of San Joaquin County, which were denied by this court. Similar proceedings were filed in the Supreme Court and likewise denied. The trial court also denied the motion of Sugarman for a separate trial. At the conclusion of the trial the jury found all three of the defendants guilty as charged. Motions for arrest of judgment and for a new trial were thereafter made, and denied by the trial court. Each defendant was sentenced for the term prescribed by law. As to Martin the sentences on counts one and two were imposed to run concurrently, and the sentences on counts three, four, five, six, seven and eight to commence at the expiration of the sentences in counts one and two, and likewise to run concurrently. A like sentence was pronounced on Burton. Sugarman was also sentenced to state prison for the term prescribed by law, the sentences pronounced on counts one, two and nine to run concurrently. Motions for a stay of execution under section 1243 of the Penal Code were granted as to each defendant.

Subsequent to the filing of the clerk's and reporter's transcript in this court Burton was accidentally killed, and upon suggestion of this fact to the court by means of stipulation of counsel for said defendant and for respondent, his appeal was dismissed as moot.

We will endeavor to summarize in narrative form the voluminous record of over 6,000 pages as it pertains to both of the remaining defendants. Following such summary we will consider separately the appeal of defendant Martin and the appeal of defendant Sugarman.

On February 2, 1946, Burton and Mary Burton were the owners of an office building known as the Don Burton Building in the city of Stockton. Burton was also the owner and operator of a shoe store situated on the ground floor of said building. He carried two policies of fire insurance with the Phoenix Assurance Company, one policy covering the fire insurance on the building and a second policy covering the stock or merchandise located in the ground floor shoe store. He also carried a policy of fire insurance with the St. Paul Fire and Marine Insurance Company, covering furniture, fixtures and equipment in the building. A further policy of insurance known as use and occupancy or business interruption policy was carried with the Connecticut Fire Insurance Company.

At approximately the hour of 3:45 o'clock p. m., on Satur-

day, February 2, 1946, the Stockton Fire Department responded to a fire alarm from the Burton building. The fire station was situated in the same square or block in which the Burton building is located. Various employees of the fire department testified concerning the condition which they found upon responding to the call, which testimony was in general that an oil fire, which covered an area of approximately 3 by 2 feet and approximately 3 feet in height, was burning on the cement floor in front of the main boiler in the basement of said building. From the time the fire department received the call until the blaze was extinguished no more than three to five minutes had elapsed. The smoke, which was confined to the furnace room, was insufficient to cause discomfort to the firemen or to discolor their clothing or faces. The captain in charge of the company responding to the call remained in the basement for approximately 30 minutes before leaving, and at that time the smoke had cleared. The fire was extinguished by making two passes over the blaze with what is known as a booster line equipped with what is termed a dual-purpose nozzle opened to the fog position, which operation consumed approximately one quart of water. After putting out the fire and cleaning up the basement some of the firemen went into the shoe store with the idea of ventilating it but observed no smoke and took no further action. These witnesses noticed no excitement among the clerks or customers in the shoe store. The chief of the Stockton Fire Department, who had 35 years of experience as a fire fighter, testified that as a result of the fire there was no damage whatever. Other members of the fire department went through the upper floors of the building but noticed no smoke, heat or soot. One member, who was serving as a watchman after the company had returned to their station, had occasion to examine merchandise in the basement storeroom and noticed that while the shoes there stored were dusty there was no trace of soot upon them.

Employees of the shoe store testified that some smoke was noticed coming through the ventilators which was the reason for calling the fire department, that the smoke caused no discomfort to the employees or to the customers then in the store and that business went on as usual. These employees further testified that they saw no soot or other damage to the shoes on display nor did they observe any of the merchandise or show cases being cleaned. They did not know of any merchandise which was exchanged or returned on account

of smoke or fire damage, nor did they know of any special sales or price reductions on account of the damage resulting from the fire. Some of these witnesses also testified that they observed no soot or smoke damage to the carpets or other furniture or furnishings in the store after the fire although prior to that time the ceiling of the store was not clean and needed painting. The elevator operator in the building testified that the elevator was operating during the time of the fire and that there was neither smoke in the lobby nor in the elevator shaft until she opened the basement door. She further testified that her hat, which was left on a shelf in the basement, was not damaged by smoke or soot. Two janitresses who reported for work about 5 o'clock that afternoon testified that although they had both heard of the fire neither of them saw any evidence of it. Their work clothes which were always hanging on hangers in the basement, and were so hanging during the entire time, showed no evidence of soot or smoke damage. These witnesses also testified that during the cleaning of the upper floors of the building they noticed no evidence of any damage. The building manager gave similar testimony concerning the condition of the basement, the upper floors and the shoe store. An expert witness from the University of California testified that in his opinion little or no smoke from the fire would have found its way above the street level of the building. The electric motor which drove the oil burner was not damaged. It protruded in front of the furnace and was located some 20 inches above the ground directly over the fire. Witnesses who had been customers in the store during the time of the fire smelled and observed smoke but suffered no inconvenience therefrom.

On the morning after the fire Martin was called by a Sacramento insurance agent and asked to proceed to Stockton with reference to the fire loss. The insurance agent also made an appointment for Martin and Burton, and the two drove to Stockton that afternoon. At that time Martin had not been definitely employed by the insurance companies. This fact was made known to Burton, who also was told by Martin that he would go to San Francisco the following day and personally see the insurance companies in an attempt to secure the authority to handle the losses. Martin then drove to San Francisco with advance adjuster's reports and delivered two of them to a Mr. English, manager of the Phoenix Assurance Company. He informed said manager that there had been a very great loss and requested the aid of a salvage man. He

further inquired whether the company would have any objection to the employment of Sugarman to render such aid, to which the manager replied that they had none. English had known Sugarman for approximately 30 years, while Martin and Sugarman had been acquainted for eight years, and at the time of said interview Martin was in Sugarman's employ for the purpose of appraising certain property in Portland, Oregon. Martin stated to English that he knew that Phoenix had other adjusters in Stockton but that the Sacramento agent desired him to handle the adjustment, and English agreed to this suggestion. Martin next went to a Mr. Schulte in the office of the St. Paul Fire and Marine Insurance Company, where he reported that he was to be the adjuster for the Phoenix Assurance Company and solicited the job of adjusting the loss of the St. Paul Company. Mr. Schulte thereupon directed him to handle the necessary adjustment for his company. Martin next went to the Connecticut Fire Insurance Company where he made a similar request, and a Mr. Wendland directed him to represent the Connecticut Company. Thereafter Martin went to the office of Sugarman Brothers, where he met the two brothers, Harry and the defendant Ben. He informed them of the fire at Stockton on the preceding Saturday and that English had chosen Sugarman to handle the salvage. The following day, February 5, Sugarman drove alone to the shoe store in Stockton which was the first trip he made to the Stockton store. There he was introduced by Martin to the manager of the store and proceeded to inspect the merchandise in the store and stock rooms. Sugarman testified that at that time he determined the merchandise had been damaged but was unable to determine the salvage thereof as the merchandise inventories were in Sacramento. He and Martin then made a date to meet in Sacramento the next day.

The following day Sugarman drove from San Francisco to Sacramento and met Martin in front of the Burton Shoe Store in that city at about 11 o'clock in the morning. Martin introduced him to Burton. The testimony is contradictory as to the conversation between these defendants and an employee of Burton, a Mr. Saunders. Martin testified that Burton objected to having his stock taken over for salvage while Sugarman testified that he was left alone with Saunders while Martin and Burton held a private conversation. Sugarman then requested that inventory figures, in addition to what was then shown him, be placed at his disposal and directed

Martin to call him when this was ready. Martin encountered some difficulty in obtaining these figures from Burton and it was not until the middle of the following month that they were made available to Sugarman. Some of this information was contained on adding machine tapes which were furnished Martin and which were later incorporated by him in his proof of loss. These adding machine tapes were shown by Martin to Sugarman who placed the figures and computation on a sheet of paper which ultimately was admitted in evidence. No written report was given by Sugarman to Martin as to whether or not the Phoenix Company should take over the Burton stock for salvage, but instead he prepared one of his own in writing, all of which later became ''People's Exhibit No. 3.'' The figures set forth in this exhibit were thereafter incorporated in their entirety into Martin's final proof of loss for the Phoenix Company, upon which payment was made to Burton by that company. Martin informed Sugarman he was going to use the percentage arrangement which Sugarman had worked out in said exhibit as the basis of settlement with Burton, and on cross-examination Sugarman admitted he knew Martin planned to do so. The figures so prepared by Sugarman were identical to the figures used by Martin, and the same was paid by the Phoenix Assurance Company.

During February, 1946, Burton, acting upon the suggestion of Saunders, hired one Harry Ex, an adjuster, to represent him. Ex and Sugarman had known one another and had been together in business deals for 20 years. In 1941, they had been associated in the Pacific Trading Company, and a Mr. Bartlett, who had been an adjuster for Sugarman Brothers in Los Angeles had known Ex for 10 years. They had shared offices together and during that time both sent remittances to Sugarman Brothers in San Francisco. Martin, who had full knowledge of the activities of Ex, was asked by Burton to explain the functions of Ex to one Knittle, the income tax expert for Burton, and to a Miss Brudigan, head bookkeeper for Burton. Martin later explained to Miss Brudigan that the large fee paid by Burton to Ex was none of his concern as it was entirely between Burton and Ex. Upon arriving in Sacramento Ex advised Burton not to let Sugarman know he was on the case and submitted a contract for his employment, which Burton signed. The manager of the Stockton store prepared a detailed inventory for Ex and thereafter he and Burton had three or four telephone conversations in which Ex advised Burton how to handle his claim. Ex called

at Burton's Sacramento office on March 1, and desired to know the basis on which the claim had been settled. When Burton informed him that the settlement was for a bit more than $15,000 Ex insisted upon an immediate settlement of 10 per cent upon the whole inventory if he succeeded in saving the stock. To settle this demand of Ex, Burton gave him a check that day for $8,500. Burton's settlement with Martin was made without a final consultation or approval of Ex. The following day, March 2, 1946, Ex appeared at the San Francisco main branch of the Bank of America and presented the $8,500 check, which was drawn on the Capital National Bank of Sacramento against the account of Don L. Burton. At that time Ex filled out an application for exchange requesting that a cashier's check be purchased. People's Exhibit 39 indicated that a cashier's check in the sum of $3,312.50 was then purchased. The residue, $5,187.50 was then transferred over to the commercial department and that amount taken in cash. On said People's Exhibit appears the notation, "M. J. Simpson for Harry Ex." The debit slip which went through the commercial department indicates that it was paid in cash. Two names appear at the bottom of the document, "A. Semenza," the receiving teller who was an assistant cashier in charge of the exchange department, and "M. J. Simpson," a vice-president of the bank. Simpson indicated that he either received the money or an authorization for the payment thereof. The record further discloses that from February 28, 1946, to September 23, 1946, defendant Sugarman and said Simpson were joint tenants of safe deposit box number 9016 in the San Francisco main office of said bank. From the latter date, September 23 to May 24, 1947, safe deposit box number 409 in said branch of said bank was in the name of defendant Sugarman and his brother Harry Sugarman, with power of attorney or agency held by said Simpson. On May 24, 1947, the tenancy of the last numbered safe deposit box was placed exclusively in the name of Ben Sugarman. This was the same day that M. J. Simpson was subpoenaed to give testimony before the San Joaquin County Grand Jury. On March 5, 1946, Ex negotiated cashier's check of $3,312.50 through the Union Bank and Trust Company in Los Angeles and was paid by Bank of America on March 6, 1946. On June 22, 1946, a deposit of $770 was made to the account of Frank O. Martin, general adjuster, in the Tule Lake Branch of the Bank of America. Five

hundred and twenty dollars of this deposit was represented by a check drawn against the account of Sugarman Brothers on the main office of the Bank of America in San Francisco.

During the month of February, 1946, Burton engaged one Wolters, who gave Martin an estimate of the painting job. Wolters was told by Martin to proceed with the painting of the basement, the shoe store and the halls and stairway. Wolters thereafter repainted the shoe store, necessitating it being closed for one day. He also painted the basement, two storage rooms, the back stairs, all of the corridors, including ceiling, walls and woodwork on every floor of the building. He also painted some 36 offices in the building. His statement in the sum of $9,610.60 was mailed to defendant Don Burton at Sacramento, together with a blank billhead. Thereafter a Mrs. O'Neil, a stenographer for Martin in his Sacramento office, and at his direction filled in the blank billhead raising the amount to $14,952.51. Burton paid Wolters from time to time during the course of the painting three checks in the sum of $2,500 each, and a final check in the sum of $2,110.60, making a total of $9,610.60. Burton, however, received the sum of $14,952.51 from the Phoenix Company by reason of Martin's acts in raising the painting bill.

On October 1, 1946, Martin went to Stockton and handed Wolters a check in the sum of $1,957 which he asked Wolters to cash and return the proceeds to him. Martin requested Wolters to show this check on his books and also told him that he would take care of any increase in Wolter's income taxes. Martin also accompanied Sugarman and Sugarman's son to see Wolters in 1947 when Wolters was told to keep quiet and not talk to anyone. On February 4, 1946, Martin prepared the adjuster's report to the St. Paul Company, wherein he estimated a 20 per cent loss to the insurance company. The following month he forwarded to the company a report in which he raised his estimate of loss from 20 to 55 per cent. In this report Martin mentioned that the immense volume of smoke "permeated not only the involved store but also the entire office building, making it necessary to immediately close down the store and rush the customers out . . . the oily smoke turned the walls and ceiling to a deep brown and badly damaged the rugs and draperies and counters and show cases."

On July 20, 1946, a further letter was forwarded by Martin to the St. Paul Company advising them that the estimate of loss should be raised from 55 per cent to 85 per cent. On

October 24, Martin filed his final adjuster's report to the St. Paul Company, which was submitted in connection with the certain statements of proof of loss executed by Burton. Attached to the Martin final report and Burton's proof of loss were appended statements for draperies, carpets and other materials, labor and window lettering. Upon receipt of these documents the St. Paul Company issued a draft to Burton for $6,716.57 in payment of the claim of loss. Martin also forwarded a statement to the St. Paul Company in the sum of $132.50 which likewise was paid. On February 4, 1946, Martin prepared an adjuster's report to the Connecticut Company estimating a loss of 10 per cent on the use and occupancy policy carried with that company. In a previous letter from Martin to that company he stated that the store did not open at 10 o'clock a. m. on five different days, and that there were two days when the store was closed, and that there was a loss of business from 3:15 to 5:30 o'clock p. m. on the day of the fire. Martin's final adjuster's report and the proof of loss sworn to by Burton was forwarded to the Connecticut Company and thereafter that company issued its draft to Martin in the sum of $166.96 as payment for his services and issued its draft for $2,029.61 to the Don L. Burton Shoe Salon in payment of the proof of loss submitted or claimed by him. After Martin had surrendered to the District Attorney of San Joaquin County in the office of the Department of Justice in Sacramento, he turned over to the department certain records and files from his office and included therein was the previously referred to Exhibit No. 3 which Martin stated was the computation of the stock loss as drawn up by Sugarman and that it was in the latter's own handwriting. Martin further stated at that time that the figures so set forth were the basis of the computation of the loss submitted and that his schedule dated February 2, 1946, relating to shoes, carpets, furnishings and other merchandise showing an alleged damage of $15,550.59 were prepared from the information given him by Sugarman. The figures having been copied by Martin are without correction or alteration as to his statement of the cash value and loss submitted to the Phoenix Company.

## APPEAL OF DEFENDANT MARTIN

Martin first contends that there is no substantial evidence to support the finding that he acted dishonestly. This contention is amplified by the argument that had the prosecution been able to establish that there had been no fire at all then

the judgments of conviction clearly would be proper. But he argues that as the actuality of the fire was clearly established then it cannot be asserted that there was no damage, and hence the mere fact that Burton secured an advantageous settlement or that conclusions might differ as to the extent of the damage are not proof of any wrongdoing on the part of this appellant. He further contends that all of the evidence against him is negative and circumstantial; that such evidence shows that he relied upon the representations of others and that the State produced no evidence to rebut this fact.

Although defendant takes up separately the evidence regarding each of counts one to eight inclusive it would appear unnecessary to discuss each at length herein since the applicable rules attach with equal propriety to each count.

The record herein presents the usual conditions in cases where the evidence on the part of the prosecution is circumstantial and is contradicted by direct evidence on the part of defendant. However, " [t]he law makes no distinction between direct and circumstantial evidence . . . [t]herefore if the circumstances relied upon by the prosecution reasonably justify an inference of guilt, but an inference of innocence might also reasonably have been drawn, it was for the jury, as between these two inferences, to choose, and unless it is obvious that the evidence does not warrant the inference of guilt adopted by the jury, this court is powerless to interfere." (*People* v. *Rubio*, 75 Cal.App.2d 697, 707 [171 P.2d 737].)

In proving the conspiracy herein charged it was not necessary for the State to prove that the parties actually came together, mutually discussed their common design, and after reaching a formal agreement set out upon their previously agreed course of conduct. The extent of the assent of minds which are involved in a conspiracy may be, and from the secrecy of the crime usually must be, inferred by the jury from the proofs of the facts and circumstances which, when taken together, apparently indicate that they are parts to the same complete whole. (*People* v. *Jones*, 136 Cal.App. 722 [29 P.2d 902]; *People* v. *Benenato*, 77 Cal.App.2d 350 [175 P.2d 296].)

The evidence as previously summarized amply supports the rule as stated. Although what we have heretofore said in that regard applies equally to each count yet by reason of the strenuous attack by appellant upon the evidence relied upon by the prosecution in support of counts seven and eight further discussion of this question would appear necessary.

Even if it be true, as appellant contends, that the prosecution labored under a complete misunderstanding of the coverage involved in the use and occupancy policy issued by the Connecticut Fire Insurance Company, nevertheless such misunderstanding was not fatal, as the essential elements remained. An agent of the company testified concerning the nature of the coverage set forth in the policy and was cross-examined at length in this regard. There is evidence that the store was closed for one day only. Contradictory to this is the statement contained in a letter from defendant to the company that on five days the store did not open until 12 o'clock rather than the usual hour of 10, thereby losing two hours each day. Further, that the store was closed for two full days while the repainting was in progress and that there was additional loss on the day of the fire from 3:15 o'clock to 5:30 o'clock p.m. The letter also included a statement by defendant that he had verified such information by conversations with the painter and store manager. Appellant attempts to show that such statement was wholly immaterial, that is, that whether the store was wholly closed or not or that business was interrupted is immaterial as both conditions were covered by the same policy. However, the fact remains that such a report was made and that there is evidence that the information therein contained was false. In fact both of the persons therein named, the painter and the store manager, denied such statements when called as witnesses.

Under such circumstances we cannot say that the jury was not reasonably justified in drawing an inference of guilt from the evidence. The right to draw proper inferences is one of the functions of the jury and if the inference so drawn does not do violence to reason this court will not interfere. (*People* v. *Latona*, 2 Cal.2d 714 [43 P.2d 260].)

It likewise appears immaterial whether or not the actual policies of insurance were introduced into evidence by the State. As stated, agents of the companies testified at length and were cross-examined by defendant's counsel. No objection was made to their testimony on any ground. While the fact of insurance was an essential element of the People's case the actual policy was not. The existence thereof was shown by the testimony of the agents as well as a general statement of the contents. In view of this showing in the record and defendant's failure to object we cannot say that prejudicial error resulted from the failure of the State to introduce the policies in evidence.

■ Appellant's next contention relates to the sufficiency of the evidence to show the commission of any overt act in San Joaquin County as charged in the first, third, fifth and seventh counts in the indictment. From our examination of the evidence it appears, and in fact is not denied, that Martin made numerous trips to Stockton. He inspected the premises, he engaged a painter to redecorate the shoe store and he also requested Wolters to cash a check, which check was issued by Burton to Wolters, who in turn gave the proceeds to Martin. As stated in *Loser* v. *Superior Court*, 78 Cal.App.2d 30 [177 P.2d 320], conspirators may be prosecuted in any county in which an overt act was accomplished. Martin as a principal was responsible for the acts in furtherance of the defendant's concerted plan to commit the crime. It is apparent that the offenses charged were partly committed in Sacramento, San Joaquin and San Francisco counties, giving jurisdiction to each county. (*People* v. *Benenato, supra.*)

■ Appellant next asserts that the evidence is insufficient to show venue in San Joaquin County for the prosecution of any of the eight offenses charged against him. Appellant premises his contention on the ground that the acts requisite to the consummation of the various offenses were: (1) preparation of the proofs of loss, (2) execution of the proofs of loss, (3) mailing proofs of loss to the companies, (4) securing drafts from the insurance companies, and (5) accepting payment from the insurance companies, and that none of them were committed within San Joaquin County. Section 182 of the Penal Code provides in part that "[a]ll cases of conspiracy may be prosecuted and tried in the superior court of any county in which any overt act tending to effect such conspiracy shall be done." Additionally Penal Code, section 781, provides that "[w]hen a public offense is committed in part in one county and in part in another, or the acts or effects thereof constituting or requisite to the consummation of the offense occur in two or more counties, the jurisdiction is in either county." Under these provisions it is sufficient if some act or effect thereof occurred in San Joaquin County which act or effect is requisite to the completion of the offense although not essential to its commission. (*People* v. *Megladdery*, 40 Cal.App.2d 748 [106 P.2d 84]; *Loser* v. *Superior Court, supra.*) That such acts or effects thereof did occur in San Joaquin County is apparent from the foregoing statement of the evidence.

■ Appellant next asserts that there was not sufficient evidence produced before the grand jury to justify his indictment and that the court thus erred in denying his motion to quash the indictment on that account. Appellant refers to *Greenberg* v. *Superior Court,* 19 Cal.2d 319 [121 P.2d 713] in which it was held that an indictment is invalid if it is unsupported by any evidence produced before the grand jury. In so holding the court expressly recognized that if there is some evidence to support the indictment, the courts will not inquire into its sufficiency. An examination of the transcript of the proceedings before the grand jury reveals that there was ''some'' evidence produced supporting the indictment and therefore no error was committed by the trial court in denying the motion to quash.

■ Appellant next contends that portions of the evidence admitted by the court were too remote to be admissible as to him and that the court erred in not ruling as to which of the joint defendants the evidence so admitted was applicable. Additionally appellant asserts that the court erred in excluding certain evidence proffered by him. The record, which consists of upwards of 6,000 pages of testimony is obviously too long to permit this court to set forth the numerous instances of asserted error in this regard contained therein and in part referred to in appellant's brief. Nevertheless, the record has been carefully examined and while it is true that some of the specifications appear to be meritorious we see no error of such a prejudicial nature as to entitle the defendant to a reversal of the judgment in the light of article VI, section 4½ of the Constitution. Particularly is this true in view of the ample evidence in support of the judgment contained in the record.

■ Appellant next contends that the court unduly restricted the cross-examination of the witness Wolters, allegedly to the prejudice of appellant. Again, the bulk of the record pertaining to the direct and cross-examination of the witness prescribes against setting forth the substance thereof. The rule is well established that the trial court is vested with discretionary power over cross-examination. When the evidence of a defendant's guilt is clear and convincing as it is in this case it cannot be said that prejudicial error resulted from the attacked restriction of defendant's cross-examination of such witness. (*People* v. *Carson,* 74 Cal.App.2d 834 [169 P.2d 677].) We are satisfied that in view of the record herein even if it be conceded that the trial court abused its discretion

in this regard appellant did not sustain such prejudice within the meaning of article VI, section 4½ of the Constitution as to require a reversal.

Appellant next urges error in the instruction given by the court in regard to a special verdict submitted to the jury upon the question of the jurisdiction (venue) of the court. Complaint is made to the language employed in regard thereto as well as to the alleged prejudicial effect thereof. Appellant's attack upon the sufficiency of the evidence to establish jurisdiction (venue) in San Joaquin County has been discussed above and decided against appellant as has his attack upon the sufficiency of the evidence to sustain the judgment. Thus, even if it be conceded that the instructions were improper we are unable to conclude that the jury was misled or its verdict the result of a misconception of the law. (See *People* v. *Honeycutt*, 29 Cal.2d 52 [172 P.2d 698] ; Const., art. VI, § 4½.)

Appellant further urges that the failure of the court to give an unrequested instruction as to what constitutes an accomplice and the necessity for corroboration of the testimony of an accomplice constitutes reversible error. Appellant argues that Wolters, who was retained by appellant to do the painting after the fire, was an accomplice in the commission of the crimes of which appellants stand convicted. While certain portions of the record substantiate this contention it does not follow that the failure of the court to give an instruction upon its own motion constituted reversible error. It is apparent from the statement of the evidence, *supra,* that there is sufficient evidence to support the judgment without considering the testimony of the alleged accomplice. Under such circumstances the failure of the court to give an instruction upon its own motion does not constitute reversible error. (See *People* v. *Warren,* 16 Cal.2d 103 [104 P.2d 1024].)

Appellant Martin's last contention, which is not joined in by appellant Sugarman, is that Mr. Watson, the district attorney, was guilty of prejudicial misconduct in "demanding a bench warrant for the arrest of prosecution witness Harry Ex," in the presence of the jury. All that the record shows that the district attorney did in this connection was to request leave to file a subpoena which had been served on Harry Ex, and to state, on inquiry by attorney for defendant Sugarman whether said witness was to be there, that as far as he knew he was not there. Thereupon the court stated: "Very well, you may take a bench warrant." At

that point Martin's counsel, Mr. Wyatt, asked permission to question the district attorney regarding the subpoena, saying he thought the matter "should go on record." The court then asked if they did not think such matters should be taken up in the absence of the jury, to which Mr. Wyatt said it was "too late." He then proceeded to question Mr. Watson, apparently in an attempt to show that the latter was not acting in good faith in connection with the subpoena, and the failure of the witness to be present. The court, apparently on its own motion, then instructed the jury that the fact that the court issued a bench warrant for witnesses did not constitute any evidence against defendants whatsoever; that it was not to consider any statements in reference to the applications for the issuance of the bench warrants as evidence in the case, nor draw any inferences "from any matters here that have been stated either by the court or the attorneys in the case." This admonition was subsequently repeated in substance. Appellant argues that the testimony given by Mr. Watson, and also testimony subsequently educed from assistant district attorney, Mr. Firth, indicates that in securing the issuance of the bench warrant for Harry Ex the district attorney was not acting in good faith. Whatever may be the fact in that respect, it must be conceded that his only conduct in the presence of the jury was to ask leave to file the subpoena, and that all that was thereafter brought out on the subject in the presence of the jury was brought out by the attorneys for appellants, after being questioned by the court as to the wisdom of such course.

We are unable to say that the conduct of the district attorney in the presence of the jury did or could result in a miscarriage of justice. On the contrary, if, as appellant contends, the evidence which he brought out shows that the district attorney did not act in good faith, the inferences to be drawn from such showing would seem to be unfavorable to the prosecution rather than to the defendants.

In view of the voluminous record which discloses ample evidence of the guilt of appellant we are unable to perceive that the misconduct of the district attorney, if it was such, had a material effect upon the determination of the jury and therefore we are constrained to hold that it was not of such a prejudicial nature as to lead to the conclusion that a miscarriage of justice has resulted therefrom. (See *People* v. *Macias,* 77 Cal.App.2d 71 [174 P.2d 895].)

Appeal of Defendant Sugarman

Appellant Sugarman raises several points on his appeal, many of which are substantially the same as those raised by appellant Martin and the disposition of those points in the Martin appeal likewise governs the disposition on this appeal. Consequently, mention will only be made herein of those points raised by Sugarman which were not raised by Martin.

This appellant first contends that the evidence is insufficient to support the judgment appealed from. While this point was not specifically considered in the Martin appeal as applied to this appellant, nevertheless, the law enunciated therein is equally .applicable and it is our judgment that the detailed summary of the evidence, *supra*, reveals substantial evidence to support the judgment appealed from.

Appellant next contends that the court erroneously overruled his demurrer to the indictment which was based on an alleged misjoinder of causes of action. In arguing this point he asserts that separate offenses against separate defendants were charged in a single indictment. In a recent decision, the Supreme Court held that different offenses may be joined, even though they do not relate to the same transaction or event, if there is a common element of substantial importance in their commission. (*In re Pearson*, 30 Cal.2d 871 [186 P.2d 401].)

It clearly appears that in each of the main circumstances the occurrence of the fire, the subsequent attempts to defraud the insurers, and the filing of false claims and appraisals, is a common element of substantial importance in the offenses included in the indictment so as to permit their joinder. Whether or not such joinder is permissible, when in addition to the joinder of separate offenses separate defendants are involved, presents a question more difficult of solution. However, separate offenses were charged against separate defendants in *People* v. *Flores*, 62 Cal.App.2d 700 [145 P.2d 318], and it was there decided that such joinder was authorized by Penal Code, sections 954 and 1098. *People* v. *Guerrero*, 22 Cal.2d 183 [137 P.2d 21], is to the same effect. On the basis of the foregoing authorities we hold that the trial court did not err in overruling appellant's demurrer.

Appellant's next contention is that the court erred in denying his motion for a separate trial in that much of the evidence introduced at the trial pertained to the charges against Martin and Burton and not to him. His argument is that prejudice resulted therefrom in that it was impossible for

the jury to segregate the large mass of evidence introduced and apply it to the applicable defendant. Appellant concedes the established rule that the action of the trial court in denying the motion for a separate trial is to be weighed and determined upon the factual situation existing at the time the motion was made and not upon what transpired thereafter. (*People* v. *Erno*, 195 Cal. 272 [232 P. 710] ; *People* v. *Tinnin*, 136 Cal. App. 301 [28 P.2d 951].) The law does not confer a right to a separate trial upon a defendant jointly charged with others, but to the contrary vests the trial court with discretion in granting a separate trial with which an appellate court will not interfere in the absence of a showing of an abuse of discretion. (*People* v. *Baa*, 24 Cal.2d 374 [150 P.2d 1].) In *People* v. *King*, 30 Cal.App.2d 185 [85 P.2d 928], where a like question was raised, the court stated as follows, at page 206 :

"Since the enactment of section 1098 of the Penal Code, in its present form, a defendant jointly charged is not entitled to a separate trial as a matter of right, and the question of severance rests entirely in the discretion of the trial court. . . . It is not an abuse of discretion to refuse to grant a motion for a severance because damaging testimony or the admission of confessions of a codefendant might be admitted in evidence against such codefendant, and not be admissible against the moving defendant.'' See, also, *People* v. *Baa, supra.*

In view of the foregoing and the fact that much of the evidence relating to the fire and the extent of the damage, if any, thereby caused would necessarily have to be introduced if appellant were tried separately, we are unable to conclude that the trial court abused its discretion in this regard.

Appellant lastly contends that the effect of the action of the trial court in denying his motion for a new trial whereby he was forced to submit to a joint trial constituted a violation of due process of law in violation of section 1, article XIV of the Constitution of the United States. Since we have concluded that the trial court acted within the discretion with which it was vested by section 1098 of the Penal Code, such contention in reality attacks the validity of said statute.

It is sufficient to state that as the court said in *People* v. *Yeager*, 194 Cal. 452 [229 P. 40], "It is within the province of the legislature to vest the trial court with authority to decide whether there shall be a separate or a joint trial of defendants jointly charged." In *People* v. *Dowell*, 204 Cal. 109 [266 P. 807], wherein the validity of the statute was in

issue, the court stated that "[t]here is no federal question, constitutional or otherwise, involved."

The judgments and orders appealed from are affirmed.

A petition for rehearing was denied May 19, 1949, and appellants' (Sugarman and Martin) petitions for a hearing by the Supreme Court were denied June 2, 1949. Carter, J., and Schauer, J., voted for appellant Sugarman's petition for a hearing.